# BARRY LEE COHEN *v.* NANCY ROSSI ET AL.
## (SC 20737)

Robinson, C. J., and McDonald, D'Auria,
Ecker, Alexander and Keller, Js.

*Syllabus*

The plaintiff, the Republican mayoral candidate for the city of West Haven
in the November, 2021 election, sought a writ of mandamus compelling
the defendants, including H, the West Haven city clerk, and certain other
West Haven election officials, to set aside the mayoral election results.
The plaintiff appeared to have lost the election by a slim margin, but
the closeness of the election triggered an automatic recanvass, and
the certified election results following the recanvass showed that the
plaintiff had lost by thirty-two votes. The plaintiff claimed, inter alia,
that the election officials had failed to adequately comply with various
statutes governing the absentee ballot process, including the provision
(§ 9-140c (a)) requiring, inter alia, the municipal clerk to endorse over
his or her signature, on each outer ballot envelope as the clerk receives
it, the date and time it is received, the provision (§ 9-140c (j)) requiring
the municipal clerk and the registrars of voters, each time the clerk
delivers absentee ballots to the registrars for counting, to execute affida-
vits of delivery and receipt stating the number of ballots delivered, and
the provision (§ 9-140b (a)) governing the manner in which voters or
certain designated persons must return absentee ballots to the municipal
clerk. The evidence established that the West Haven City Clerk's Office
received 720 absentee ballot envelopes either by United States mail, in-
person delivery, or through a voter's or designee's depositing the ballot
in one of three secure drop boxes that are located throughout West
Haven. Typically, upon receipt by the City Clerk's Office, the absentee
ballots, sealed in inner and outer envelopes, were time-stamped,
endorsed by H using a stamp with a facsimile of her signature, and
logged into the electronic state database, from which an absentee ballot
report was produced. H testified that she personally retrieved the absen-
tee ballot envelopes from the drop boxes about, or at least, one half of

Cohen *v.* Rossi

the time, and that an employee of the City Clerk's Office retrieved them the other one half of the time. Of the 720 absentee ballot envelopes, 711 were counted while 9 were rejected and not counted. Of the 711 counted absentee ballot envelopes, there were 8 outer envelopes for which there was no entry in the election day absentee ballot report. Additionally, 14 of the 711 ballots were received on election day but were not immediately time-stamped and endorsed by H, who testified that she was not present in the City Clerk's Office on election day. The 14 "same day" ballots had been received by the City Clerk's Office before 3 p.m. on election day, but they were held until the count was complete so that they initially could be divided into districts and checked against the official books for each district. When it was discovered that the same day ballots did not contain H's endorsement, and it was confirmed that they had been timely received, the Office of the Secretary of the State advised the election officials to have the assistant city clerk, R, endorse the ballots by hand and to count them, which R did. In addition, there was testimony that no affidavits of delivery and receipt had been executed in connection with the absentee ballots. Following trial, the plaintiff raised the additional claim that H had violated § 9-140b (c) (2), which provides in relevant part that "the municipal clerk shall retrieve [the absentee ballot envelopes] from the secure drop box," insofar as H failed to personally retrieve at least 200 absentee ballots from the drop boxes. In arriving at that figure, the plaintiff relied on evidence that, of the 711 counted outer envelopes, 273 were postmarked and 25 were returned in-person, and inferred that 413 absentee ballots were returned through the drop boxes. On the basis of that inference and H's testimony that she had retrieved the ballots about one half of the time, the plaintiff argued that it was fair to conclude that at least 200 absentee ballots were retrieved by someone other than H. The trial court ultimately concluded that substantial violations of the election statutes had occurred and that 9 absentee ballots had been improperly counted or unaccounted for. In so concluding, the court disagreed with the plaintiff's claim that certain absentee ballots were returned by improperly designated persons, in violation of § 9-140b (a), but agreed that the failure of H and the registrars of voters to execute affidavits of delivery and receipt constituted a clear violation of § 9-140c (j), which was enacted to prevent fraud in the absentee ballot process by establishing chain of custody procedures. The trial court nevertheless determined that the reliability of the election results was not seriously in doubt because, even if the court assumed that the 9 improperly counted or unaccounted for absentee ballots favored the plaintiff, he still would have lost by 23 votes. Accordingly, the court denied the plaintiff's requested relief and rendered judgment for the defendants. Thereafter, the trial court certified certain questions of law to this court for review pursuant to statute (§ 9-325). *Held*:

Cohen *v.* Rossi

1. The plaintiff could not prevail on his claim that the plain language of § 9-140b (c) (2) required the municipal clerk to personally retrieve the absentee ballots from the secure drop boxes:

With respect to the plaintiff's claim that H's testimony established that she violated § 9-140b (c) (2) by using designees to retrieve at least 200 ballots from the drop boxes, the plaintiff failed to refer to evidence in the record establishing exactly how many ballots were retrieved by someone other than H, the plaintiff's counsel did not ask H or any other witness how many ballots were retrieved by someone other than H, the trial court made no factual findings in that regard, H's testimony that her employees would retrieve the ballots from the drop boxes one half of the time did not reveal the number of ballots someone else retrieved, insofar as different drop boxes might have contained vastly different numbers of ballots, and this court declined to overturn the election results on the basis of the plaintiff's unsupported inferences and simplistic logic.

With respect to whether § 9-140b (c) (2) required the municipal clerk to personally retrieve the absentee ballots from the secure drop boxes, although the plain language of the statute appeared to require the municipal clerk to personally retrieve the ballots, when § 9-140b was viewed in relationship to related statutes and the entire statutory scheme governing the absentee ballot process, which indicated the legislature's contemplation that the municipal clerk has the authority to and would delegate tasks to his or her designees, this court concluded that § 9-140b (c) (2) merely requires the municipal clerk, or his or her designee, to retrieve the absentee ballots from the secure drop boxes.

Moreover, even if it was appropriate to look to the legislative history of § 9-140b to ascertain the statute's meaning, this court rejected the plaintiff's argument that a 2021 amendment (Spec. Sess. P.A. 21-2, § 102) to § 9-140b (c) (2) indicated a legislative intent to permit only the municipal clerk to retrieve absentee ballots from the drop boxes insofar as that amendment omitted a requirement from § 9-140b (c) (2) that a police officer escort the municipal clerk or the municipal clerk's "designee" when retrieving absentee ballots from drop boxes located outside of the building in which the clerk's office is located, as that argument failed to reconcile § 9-140b (c) (2) with the broader statutory scheme pertaining to the absentee ballot process, which plainly contemplates that the municipal clerk will delegate tasks to his or her designees and is authorized to do so.

Furthermore, a contrary interpretation would lead to the implausible result that the municipal clerk would be required to carry out nearly the entire absentee ballot process without assistance from anyone in his or her office and to complete the virtually impossible task of personally ensuring that all ballots are received before the close of the polls, even when there are multiple drop boxes located throughout the municipality.

Cohen *v.* Rossi

Accordingly, in the absence of express statutory language requiring the municipal clerk to personally retrieve the ballots from the secure drop boxes, this court declined to interpret the legislature's 2021 deletion of language in § 9-140b (c) (2) to mean that only the clerk may carry out the statute's directive, and, in the present case, H delegated the responsibility of retrieving the absentee ballots to her subordinates about one half of the time, there was no allegation that someone outside of the City Clerk's Office retrieved the ballots, and, accordingly, the defendants complied with the statute.

2. The plaintiff could not prevail on his claims that the fourteen "same day" absentee ballots were improperly counted because the election officials did not substantially comply with § 9-140c (a), which requires the municipal clerk's endorsement, and because those ballots were treated differently from other, similarly situated absentee ballots:

a. The trial court correctly determined that, although there was not strict compliance with the mandates of § 9-140c (a), insofar as H failed to endorse the fourteen same day absentee ballots when they were received, there was nevertheless substantial compliance with the statute:

Although the provisions of § 9-140c (a) regarding a municipal clerk's endorsement of the absentee ballot envelope when it is received, which were designed to mitigate the risk of fraud in the absentee voting process, are mandatory, this court previously had determined that only substantial, rather than strict, compliance with the requirements of § 9-140c (a) is necessary and that the issue of whether an anomalous endorsement constitutes substantial compliance with § 9-140c (a) must be determined by reference to the purpose of the statutory requirement, the role played by the requirement viewed in the context of the statutory scheme, the degree of adherence to strict compliance shown, and the basic policy against dis–franchisement of voters who are not at fault for any lack of strict compliance by elections officials.

In the present case, it was undisputed that the election officials failed to strictly comply with § 9-140c (a), insofar as H did not endorse the fourteen same day absentee ballots when they were received using the stamp with her signature that she customarily used, but H was not present in the City Clerk's Office on election day and could not have personally endorsed the outer envelopes of the ballots.

Moreover, in the absence of the municipal clerk or the clerk's ability to carry out his or her duties, assistant town clerks, pursuant to statute (§ 7-19), have all the powers and may perform all the duties of the municipal clerk, the assistant city clerk and the highest ranking election official present, namely, R, thus was permitted to endorse the fourteen ballots received on election day, and, in view of the fact that R's initials were written in her own handwriting, it would have been difficult, in the

Cohen *v.* Rossi

absence of forgery, for an individual to somehow include an unauthorized absentee ballot.

Furthermore, the slight delay between the receipt and R's endorsement of the ballots was attributable to the time it took to obtain guidance from the Office of the Secretary of the State, the plaintiff did not allege that anyone tampered with the ballots, the possibility of fraudulent activity seemed particularly fanciful in light of evidence from the absentee ballot report, which showed that the fourteen same day ballots were from eligible voters and were properly delivered on election day prior to the close of the polls, and R's testimony, which indicated that the handwritten initials on each ballot were her initials and that she personally wrote them on each outer envelope, and the strong public policy against disenfranchising voters who are not at fault for problems with their ballots, also strongly militated against rejecting the fourteen same day ballots.

b. The plaintiff's claim that the trial court's inclusion of the fourteen same day absentee ballots created disparate treatment among other, similarly situated absentee ballots was unavailing:

Notwithstanding the plaintiff's reliance on the testimony of an absentee ballot counter that, during the initial count, she rejected an unspecified number of absentee ballots that lacked H's endorsement, and the testimony of the head absentee ballot moderator that nine absentee ballots received on election day "could have been rejected" due to the lack of an endorsement by H, this court could not determine, on the basis of the record before it, why each of the foregoing ballots was rejected or could have been rejected, the plaintiff failed to establish that the fourteen same day ballots were similarly situated to the ballots referenced by those individuals, and this court declined to overturn the election without evidence establishing the circumstances surrounding the rejected ballots.

3. The trial court correctly concluded that the failure by H and the registrars of voters to execute affidavits of delivery and receipt, as required by § 9-140c (j), was insufficient to establish that the reliability of the election results was seriously in doubt:

Although H and the registrars of voters failed to comply with § 9-140c (j) by not executing affidavits of delivery and receipt each time absentee ballots were transferred to the Office of the Registrar of Voters, that failure was overcome by the sworn testimony of the various election officials who failed to complete the affidavits, which the trial court credited and which established the chain of custody for the ballots, including H's testimony that the City Clerk's Office and the registrars of voters transferred all of absentee ballots that the City Clerk's Office received to the Office of the Registrar of Voters every day at the close of business and the testimony of multiple election officials regarding the various steps they had taken to maintain the chain of custody.

Cohen *v.* Rossi

Moreover, the evidence established that there was no mistake in the vote count and that the chain of custody was properly maintained, as election officials credibly testified that the City Clerk's Office and the Office of the Registrar of Voters reviewed the absentee ballot reports against the ballots themselves and that the number of absentee ballots matched the reports each time, and the plaintiff failed to adduce evidence demonstrating that the chain of custody had been broken.

Nevertheless, the court emphasized that the purpose of the affidavit of delivery and receipt required by § 9-140c (j) is to prevent fraud in the absentee ballot process by establishing the chain of custody of the ballots, that the affidavits of delivery and receipt are statutorily mandated by the legislature, and that statutory compliance is necessary, not only to maintain strong and unwavering public confidence in elections, but also to facilitate the timely, efficient, and proper resolution of election disputes that end up in court.

4. The trial court correctly concluded that the plaintiff failed to satisfy his burden of proving that certain absentee ballots had been returned by persons who were not authorized to do so by § 9-140b (a) and, therefore, did not substantially comply with the requirements of that statutory provision:

In the case of each of the challenged absentee ballots, the plaintiff did not establish the relationships between the absentee voter and the person who delivered the ballot or the circumstances surrounding the return of the challenged ballot by requesting the absentee ballot application for each voter, subpoenaing to testify the voter or the individual who delivered the voter's ballot, or questioning anyone from the City Clerk's Office regarding the process of accepting an absentee ballot from a designee or an immediate family member, and there was no evidence to suggest that the City Clerk's Office failed to perform its duties under § 9-140b (a) of having a designee or family member sign his or her name in the clerk's presence or of checking the identification of the designee or family member.

Moreover, the plaintiff's exclusive reliance on the outer envelopes of the challenged ballots could not serve to establish that the persons who returned the ballots were not qualified designees under § 9-140b (a) because there was no information, for example, regarding whether any of the voters were ill or physically disabled and, therefore, allowed to designate someone to return his or her ballot pursuant to § 9-140b (a) (1) or (3), or whether certain designees were "immediate family" members, as that term is defined by the statute.

5. The plaintiff could not prevail on his claim that the trial court incorrectly had concluded that eight absentee ballot envelopes for which there was no entry logged in the absentee ballot report were returned to the City Clerk's Office in substantial compliance with § 9-140b (a):

Cohen *v.* Rossi

Although the evidence demonstrated that there was a discrepancy insofar as eight of the counted absentee ballot envelopes were not included in the absentee ballot report, the plaintiff failed to present any evidence, and did not contend on appeal, that the outer envelopes corresponding to these ballots lacked H's endorsement under § 9-140c (a), the record of the eight ballots that were returned to the City Clerk's Office was H's endorsement on each outer envelope, and, in the absence of evidence that the ballots did not otherwise comply with the requirements of §§ 9-140b and 9-140c (a), this court could not conclude that the counting of these ballots constituted a mistake of an election official and declined to disenfranchise those voters because of a discrepancy in the absentee ballot report.

Nevertheless, the court emphasized that election officials must strive to comply with all statutory requirements pertaining to the absentee ballot process, including the requirement in § 9-140c (a) that the municipal clerk maintain a list of the names of applicants who return absentee ballots, as a failure to comply with the statutory mandates increases the risk of fraud in the absentee voting process and the risk that the municipality could face litigation, along with burdens of establishing the integrity of the electoral process and of demonstrating that the reliability of the election results is not seriously in doubt.

6. This court declined to review the plaintiff's claim that the trial court incorrectly had concluded that the reliability of the election results was not in serious doubt and that there was no mistake in the vote count on the basis of certain additional evidence in the record, as that claim was inadequately briefed:

The plaintiff provided no legal analysis or support with respect to the additional evidence that purportedly supported his claim, his cursory assertions regarding the various alleged discrepancies left this court unable to ascertain exactly what alleged error the plaintiff was claiming with respect to the additional evidence, he raised at least four separate instances of claimed irregularities in less than two pages of briefing, and the trial court did not even address some of the additional evidence on which the plaintiff's appellate claim was based.

(*Three justices concurring in part in two separate opinions*)

Argued September 16, 2022—officially released June 20, 2023

*Procedural History*

Action seeking a writ of mandamus compelling the defendants, inter alia, to set aside the results of the 2021 election for mayor of the city of West Haven, and for other relief, brought to the Superior Court in the judicial district of New Haven and tried to the court,

Cohen *v.* Rossi

*Wilson, J.*; thereafter, the court, *Wilson, J.*, denied the defendants' motion to dismiss and rendered judgment for the defendants; subsequently, the plaintiff filed a reservation of questions of law with the trial court, which certified certain questions of law and transferred the reservation to this court. *Affirmed.*

*Vincent M. Marino*, with whom was *Barbara M. Schellenberg*, for the appellant (plaintiff).

*William M. Bloss*, with whom were *Karen Baldwin Kravetz* and *Edwin J. Maley, Jr.*, and, on the brief, *Patrick L. Deegan*, for the appellees (defendants).

*Opinion*

McDONALD, J. This appeal concerns a contested mayoral election in the city of West Haven and requires us to interpret and apply various statutory provisions that govern the absentee ballot process. Following an automatic recanvass, which was triggered by the closeness of the election, the plaintiff, the Republican mayoral candidate, Barry Lee Cohen, brought this action pursuant to General Statutes § 9-328 against the defendants, the Democratic mayoral candidate, Nancy Rossi, and certain West Haven election officials,[1] challenging the results of the election. The plaintiff asserted that the West Haven election officials failed to adequately comply with various statutory requirements regarding absentee ballots. The trial court agreed that the election officials failed to strictly comply with certain statutory requirements but nevertheless concluded that the plaintiff failed to establish that the reliability of the results

---

[1] The defendants are Rossi; Patricia C. Horvath, in her official capacity as the city clerk of West Haven; Jo Ann Callegari, in her official capacity as the Republican registrar of voters of West Haven; Sherri Lepper, in her official capacity as the Democratic registrar of voters of West Haven; George M. Chambrelli IV, in his official capacity as the head moderator of the election; and Catherine Conniff, in her official capacity as the head absentee ballot moderator of the election.

Cohen *v.* Rossi

of the election was seriously in doubt. Accordingly, the trial court denied the plaintiff's requested relief. This appeal followed. Following oral argument, we issued a per curiam ruling on October 4, 2022, affirming the judgment of the trial court. We indicated at that time that a full opinion would follow. This is that opinion.

The following facts and procedural history are relevant to the appeal. At the close of voting on November 2, 2021, the results established that Rossi appeared to have won the election by a margin of twenty-nine votes. Given the closeness of the race, however, an automatic recanvass occurred. See General Statutes § 9-311a. The plaintiff attended the recanvass with his attorney and campaign manager. The certified election results following the recanvass confirmed that Rossi had won the election. Specifically, the results indicated that Rossi had received 4275 votes and the plaintiff had received 4243 votes, expanding Rossi's margin of victory to 32 votes.

On November 15, 2021, the plaintiff brought this action for a writ of mandamus pursuant to § 9-328, asserting that the election officials had failed to adequately comply with the requirements regarding absentee ballots set forth in General Statutes §§ 9-12, 9-140, 9-140a, 9-140b, 9-140c, and 9-150a. In his complaint, the plaintiff alleged that the election officials (1) failed to seal the outer and inner envelopes of absentee ballots in a depository envelope with nonreusable tape, as required by § 9-150a (f), (2) failed to endorse the names, voting district, and time of count on each absentee ballot depository envelope, as required by § 9-150a (f), (3) processed and counted absentee ballots that should have been rejected, (4) failed to process and count absentee ballots in substantial compliance with the requirements outlined in the General Statutes, (5) failed to properly maintain the chain of custody of the absentee ballots in accordance with statutorily mandated pro-

Cohen *v.* Rossi

cedures, (6) failed to properly endorse the depository envelopes in accordance with statutorily mandated procedures, (7) failed to properly endorse the absentee ballots' outer envelopes, as required by § 9-140c (a), (8) failed to prepare affidavits reflecting the times that the ballots changed hands, and (9) admitted votes from persons who were not qualified to be electors in the election.

The trial court held a hearing that extended over five months, during which the parties presented evidence over the course of six days. Relevant to this appeal, the evidence established that absentee ballots were received by the West Haven City Clerk's Office in one of three ways: (1) delivery by United States mail, (2) delivery by an elector or designee depositing them in one of three secure drop boxes located throughout West Haven, or (3) in-person delivery. Typically, upon receipt, the absentee ballots, sealed in inner and outer envelopes, would be time-stamped, endorsed by the city clerk, and logged into the electronic state database, before being placed in a city vault. Section 9-140c (a) requires the municipal clerk to execute "an affidavit attesting to the accuracy of all such endorsements . . . ." The absentee ballots would then be delivered to the registrars of voters. See General Statutes § 9-140c (e). Each time the absentee ballots are transferred from the municipal clerk's office to the office of the registrar of voters, the clerk and the registrars are required to "execute an affidavit of delivery and receipt stating the number of ballots delivered." General Statutes § 9-140c (j). The city clerk of West Haven, Patricia C. Horvath, and an absentee ballot counter both testified, however, that they were not aware of any absentee ballot affidavits executed in connection with the election.

There was a total of 720 absentee ballots in the city vault, 9 of which were stored separately as rejected ballot sets and 711 of which represent counted ballots.

Cohen *v.* Rossi

The 9 rejected absentee ballots were not counted. Out of the 711 counted ballots, there were 8 electors for whom outer envelopes existed in the vault but who are not reflected in the November 3, 2021 absentee ballot report. These 8 ballots were, however, time-stamped, endorsed and reported to the registrars of voters for recording. Indeed, all 711 outer envelopes of counted ballots contained Horvath's endorsement and time of receipt. Fourteen absentee ballots that were received on election day, however, were not immediately time-stamped and endorsed by Horvath. Hours after these fourteen "same day" absentee ballots were received on election day, at the direction of the Office of the Secretary of the State, the outer envelopes of these ballots were hand initialed, "[r]ec'd SR [denoting Sharon Recchia, the assistant city clerk] 3:00 p.m." The outer envelopes were also stamped, "NOV—2 2021."

After the plaintiff rested his case, the defendants orally moved to dismiss for failure to make out a prima facie case pursuant to Practice Book § 15-8. The trial court issued a memorandum of decision on February 14, 2022, denying the defendants' motion to dismiss. Thereafter, the defendants presented evidence, and the parties submitted posttrial memoranda. In his posttrial memorandum, the plaintiff raised an additional claim, namely, that Horvath had violated § 9-140b (c) (2) by failing to personally retrieve at least 200 absentee ballots from drop boxes, thereby invalidating those ballots.[2] Specifically, Horvath testified that, about "[h]alf

---

[2] As the trial court noted, the plaintiff raised this argument for the first time in his posttrial memorandum; he did not plead a violation of § 9-140b (c) (2) in his complaint. The court also noted that the plaintiff attempted to file an amended complaint that it denied "due to the urgency of the current action, but that complaint also did not allege a violation of § 9-140b (c) (2)." The defendants, however, did not argue before the trial court that they had been prejudiced by the late introduction of this allegation, and, therefore, the court addressed the argument. Similarly, because the defendants do not argue that we cannot properly review this claim on appeal, we address it on the merits.

Cohen *v.* Rossi

the time,'' she would retrieve the absentee ballots from the drop boxes and the other one half of the time it would be one of her employees.

On June 24, 2022, the trial court issued a memorandum of decision in which it concluded that "the plaintiff [had] met his burden of proving by a preponderance of the evidence that substantial violations of election statutes occurred. Indeed, the evidence presented show[ed] a concerning lack of overall compliance with statutory guidelines by election officials . . . .'' In addition, the trial court concluded that six absentee ballots that did not specify the relationship between the absentee voter and the person who delivered the ballot were improperly accepted because they were not in substantial compliance with § 9-140b. The trial court also concluded that an additional absentee ballot was improperly counted because the individual voter was not a bona fide resident of West Haven, as defined by § 9-12 (a). The court also noted that two additional absentee ballots marked as returned were unaccounted for. Nevertheless, the court explained that, "[e]ven if [it] assumed that rejecting all seven of these absentee ballots would favor the plaintiff *and* that the two missing absentee ballots favored the plaintiff, he still would have lost the mayoral election by twenty-three votes. Thus, the court cannot conclude that the reliability of the [election's result] is seriously in doubt.'' (Emphasis in original.) Accordingly, the trial court denied the plaintiff's requested relief and rendered judgment for the defendants.

Thereafter, the trial court certified questions of law and a finding of facts to the Chief Justice in accordance with General Statutes § 9-325,[3] and this court requested that the parties file briefs and scheduled oral argument.

---

[3] The Chief Justice subsequently ruled that no action was necessary on the plaintiff's application for certification to appeal pursuant to General Statutes § 52-265a in light of the trial court's certification pursuant to § 9-325.

Cohen *v.* Rossi

Following oral argument, we issued a per curiam ruling on October 4, 2022, affirming the judgment of the trial court. Additional facts will be set forth as necessary.

On appeal, the plaintiff raises numerous claims of error relating to the absentee ballot process in the election. Specifically, he claims that (1) the plain language of § 9-140b limits the retrieval of absentee ballots from the secure drop boxes to the municipal clerk, (2) the trial court erroneously concluded that the fourteen "same day" absentee ballots substantially complied with § 9-140c (a), in the absence of any statutory compliance by the municipal clerk, (3) the trial court's inclusion of the fourteen "same day" absentee ballots in the vote count created disparate treatment among similarly situated absentee ballots, (4) the trial court erred in concluding that the affidavit of delivery and receipt required by § 9-140c (j) is secondary to the municipal clerk's endorsement, (5) the trial court erred in concluding that the absentee ballots belonging to Lenora Tomporowski, Terry Rose Carlington, Eric S. Holland, and Carmela A. Arminio substantially complied with § 9-140b (a), (6) the trial court erred in concluding that the eight absentee ballot outer envelopes found in the city vault that were missing from the absentee ballot report were returned to the City Clerk's Office in substantial compliance with § 9-140b (a), and (7) the trial court erred in concluding that the reliability of the results of the election was not in serious doubt and that there was no mistake in the vote count. The defendants disagree with each of the plaintiff's claims and contend that the trial court properly denied the plaintiff's requested relief because the plaintiff failed to satisfy his burden of proving by a preponderance of the evidence that the reliability of the results of the mayoral election was seriously in doubt.[4] We agree with the defendants.

_____

[4] The defendants also contend that, if we disagree with the plaintiff's sixth claim—that the trial court erred in concluding that the eight absentee ballot outer envelopes found in the city vault that were missing from the absentee

Cohen *v.* Rossi

Before turning to the plaintiff's claims, we summarize the general principles guiding judicial review of those claims. Section 9-328 provides in relevant part: "Any . . . candidate claiming to have been aggrieved by any ruling of any election official in connection with an election for any municipal office . . . or any . . . candidate claiming that there has been a mistake in the count of votes cast for any such office at such election or primary . . . may bring a complaint to any judge of the Superior Court for relief therefrom. . . . Such judge shall forthwith order a hearing to be had upon such complaint, upon a day not more than five nor less than three days from the making of such order . . . . Such judge shall, on the day fixed for such hearing and without unnecessary delay, proceed to hear the parties. . . . Such judge shall thereupon, if he finds any error in the rulings of the election official or any mistake in the count of the votes, certify the result of his finding or decision to the Secretary of the State . . . ."

We have explained that "[§] 9-328 cannot be read in a vacuum. It must be read against its fundamental governmental background. That background counsels strongly that a court should be very cautious before exercising its power under the statute to vacate the results of an election and to order a new election.

"First, under our democratic form of government, an election is the paradigm of the democratic process designed to ascertain and implement the will of the people. . . . The purpose of the election statutes is to ensure the true and most accurate count possible of

ballot report were returned to the City Clerk's Office in substantial compliance with § 9-140b (a)—then the plaintiff's second, third and fifth claims are moot because only eighteen total votes are at issue with respect to those claims, which would not cast the reliability of the results of the election in serious doubt. Given the number of claims on appeal and the different numbers of ballots related to each claim, we cannot conclude that any claims would be moot as a result of a finding in favor of the defendants on any one claim.

Cohen *v.* Rossi

the votes for the candidates in the election. . . . In implementing [the voting] process, moreover, when an individual ballot is questioned, no voter is to be disfranchised on a doubtful construction, and statutes tending to limit the exercise of the ballot should be liberally construed in his [or her] favor. . . . We look . . . first and foremost to the election officials to manage the election process so that the will of the people is carried out.

"Second, § 9-328 authorizes the one unelected branch of government, the judiciary, to dismantle the basic building block of the democratic process, an election. Thus, [t]he delicacy of judicial intrusion into the electoral process . . . strongly suggests caution in undertaking such an intrusion. As we have indicated, therefore, § 9-328 provides for remedies only under narrowly defined circumstances . . . and for limited types of claims . . . .

"Third, § 9-328 requires a court, in determining whether to order a new election, to arrive at a sensitive balance among three powerful interests, all of which are integral to our notion of democracy, but which in a challenged election may pull in different directions. One such interest is that each elector who properly cast his or her vote in the election is entitled to have that vote counted. Correspondingly, the candidate for whom that vote properly was cast has a legitimate and powerful interest in having that vote properly recorded in his or her favor. When an election is challenged on the basis that particular electors' votes for a particular candidate were not properly credited to him, these two interests pull in the direction of ordering a new election. The third such interest, however, is that of the rest of the electorate who voted at a challenged election, and arises from the nature of an election in our democratic society, as we explain in the discussion that follows. That interest

Cohen *v.* Rossi

ordinarily will pull in the direction of letting the election results stand.

"An election is essentially—and necessarily—a snapshot. It is preceded by a particular election campaign, for a particular period of time, which culminates on a particular date, namely, the officially designated election day. In that campaign, the various parties and candidates presumably concentrate their resources—financial, political and personal—on producing a victory on that date. When that date comes, the election records the votes of those electors, and only those electors, who were available to and took the opportunity to vote— whether by machine lever, write-in or absentee ballot— on that particular day." (Citations omitted; internal quotation marks omitted.) *Bortner* v. *Woodbridge*, 250 Conn. 241, 253–55, 736 A.2d 104 (1999).

"Moreover, that snapshot can never be duplicated. The campaign, the resources available for it, the totality of the electors who voted in it, and their motivations, inevitably will be different a second time around. Thus, when a court orders a *new* election, it is really ordering a *different* election. It is substituting a different snapshot of the electoral process from that taken by the voting electorate on the officially designated election day.

"Consequently, all of the electors who voted at the first, officially designated election . . . have a powerful interest in the stability of that election because the ordering of a new and different election would result in their election day disfranchisement. The ordering of a new and different election in effect disfranchises all of those who voted at the first election because their validly cast votes no longer count, and the second election can never duplicate the complex combination of conditions under which they cast their ballots.

"All of these reasons strongly suggest that, although a court undoubtedly has the power to order a new election pursuant to § 9-328 and should do so if the statutory requirements have been met, the court should exercise caution and restraint in deciding whether to do so. A proper judicial respect for the electoral process mandates no less." (Emphasis altered.) Id., 256–57.

Most fundamentally, we have explained that, "in order for a court to overturn the results of an election and order a new election pursuant to § 9-328, the court must be persuaded that . . . (1) there were substantial violations of the requirements of the statute . . . and (2) as a result of those violations, the reliability of the result of the election is seriously in doubt." Id., 258. "[A]lthough the underlying facts are to be established by a preponderance of the evidence and are subject on appeal to the clearly erroneous standard; see Practice Book § 60-5; the ultimate determination of whether, based on those underlying facts, a new election is called for—that is, whether there were substantial violations of the statute that render the reliability of the result of the election seriously in doubt—is a mixed question of fact and law that is subject to plenary review on appeal." *Bortner* v. *Woodbridge*, supra, 250 Conn. 258. With these principles in mind, we turn to the dispositive issues of this appeal.

I

ABSENTEE BALLOT RETRIEVAL
FROM DROP BOXES

The plaintiff first claims that the plain language of § 9-140b (c) (2), providing that "the municipal clerk shall retrieve [the ballots] from the secure drop box," requires the municipal clerk herself to retrieve absentee ballots from each drop box location. In support of this contention, the plaintiff relies largely on an amendment to subsection (c) of § 9-140b in which the legislature

deleted, among other things, language that allowed a ''clerk's designee'' to retrieve the ballots from certain drop boxes. See Public Acts, Spec. Sess., June, 2021, No. 21-2, § 102 (Spec. Sess. P.A. 21-2). The plaintiff contends that, because the statutory text provides that the municipal clerk herself must retrieve absentee ballots from drop boxes, Horvath's testimony established that she violated § 9-140b (c) (2) by using designees to retrieve at least 200 ballots from drop boxes. The defendants contend that the trial court correctly determined that a clerk's designee was permitted to retrieve absentee ballots from drop boxes because proscribing the clerk from using a designee would require a statutory interpretation that would lead to an absurd result.

The following additional facts are relevant to this claim. At trial, Horvath testified that the City Clerk's Office placed secure absentee ballot drop boxes throughout West Haven. An employee of the City Clerk's Office would frequently retrieve the absentee ballots placed in the drop boxes, bring them back to that office, and log them in. Horvath initially testified that she had personally retrieved the ballots from the drop boxes about ''[h]alf the time . . . .'' She went on to clarify that she personally retrieved the ballots ''[a]t least [half the time]. Half or more . . . .'' The rest of the time, another employee of the City Clerk's Office would retrieve the ballots.

The trial court rejected the plaintiff's reading of the statute, concluding that ''the legislature's purpose for amending § 9-140b (c) (2) was to make the drop boxes permanent for future elections and to omit the requirement that a police officer escort the [municipal] clerk or her employees when retrieving absentee ballots from drop boxes around the town or city. There is no indication that the amendment's purpose was to require that only the municipal clerk herself retrieve the absentee ballots from the drop boxes.'' The court also noted that

Cohen *v.* Rossi

there are many tasks assigned to the municipal clerk throughout the absentee ballot statutes, and none of them references the clerk's designee, "but that does not mean the municipal clerk must perform all of these statutory duties personally." The court concluded that Horvath delegated the responsibility to her subordinates and that did not run afoul of § 9-140b (c) (2). Accordingly, the trial court concluded that Horvath's delegation of her retrieval responsibility under the statute was not an error in the ruling of an election official for purposes of § 9-328.

At the outset, we note that the plaintiff has failed to provide this court with any record evidence that establishes how many ballots were retrieved by someone other than Horvath herself. The plaintiff asserts that "[t]he evidence showed that more than 200 absentee ballots were retrieved by someone other than [Horvath]." In support of that assertion, however, the plaintiff relies on numerous assumptions. Namely, the plaintiff reasons that "[t]here [were] 711 absentee outer envelopes, with 273 of these outer envelopes with postmarks. . . . According to the November 3, 2021 absentee ballot report, 25 absentee ballot sets were returned 'in person.' . . . Therefore, it is reasonable to conclude that 413 absentee ballot sets were returned through the drop boxes." (Citations omitted.) The plaintiff reasons that, because Horvath testified that, about "[h]alf the time," she would retrieve the absentee ballots from the drop boxes and the other one half of the time it would be one of her employees, it is fair to conclude that at least 200 absentee ballots were retrieved by someone other than Horvath. We disagree. The trial court made no factual findings regarding how many absentee ballots were retrieved by someone other than Horvath, and the plaintiff never asked Horvath, or any other witness, how many ballots were retrieved by someone other than Horvath herself. Indeed, the plaintiff raised

346 Conn. 642 JUNE, 2023 661

Cohen *v.* Rossi

this issue for the first time in his posttrial brief. That Horvath retrieved the ballots about "[h]alf the time" does not inform the court of the number of ballots someone other than Horvath retrieved because different drop boxes might have contained vastly different numbers of ballots. Retrieving the ballots one half of the time could have amounted to, for example, 2 ballots or 200 ballots, or anything in between. The trial court did not draw any inference regarding the number of ballots at issue, and we decline to do so. We will not lightly overturn election results, especially not on the basis of such simplistic logic and unsupported inferences. See, e.g., *Bortner* v. *Woodbridge*, supra, 250 Conn. 254–55. Nevertheless, because Horvath testified that she did not retrieve all the absentee ballots personally, we consider the merits of the plaintiff's claim to determine whether that was permissible under the statute.

This court previously has held that the requirements of § 9-140b are mandatory. See *Wrinn* v. *Dunleavy*, 186 Conn. 125, 145–46, 440 A.2d 261 (1982) (interpreting predecessor statute). "Accordingly, the return of ballots in a manner not substantially in compliance with § 9-140b will result in their invalidation, regardless of whether there is any proof of fraud. . . . Whether fraud has been committed in the handling of certain absentee ballots is irrelevant to the question of whether there has been substantial compliance with all of the mandatory provisions of the absentee voting law. . . . Had the legislature chosen to do so, it could have enacted a remedial scheme under which ballots would . . . be invalidated [only] upon a showing of fraud or other related irregularity. The legislature has instead enacted a regulatory scheme designed to prevent fraud as far as practicable by mandating the way in which absentee ballots are to be handled. The validity of the ballot, therefore, depends not on whether there has been fraud, but on whether there has been substantial compliance with the

Cohen *v.* Rossi

mandatory requirements.'' (Citation omitted; internal quotation marks omitted.) *Keeley* v. *Ayala*, 328 Conn. 393, 411, 179 A.3d 1249 (2018).

Whether the mandatory nature of § 9-140b requires the municipal clerk personally to retrieve the absentee ballots from the secure drop boxes is a different question, and one of statutory interpretation over which our review is plenary. See, e.g., *LaFrance* v. *Lodmell*, 322 Conn. 828, 833–34, 144 A.3d 373 (2016). We review § 9-140b and the relevant statutory scheme in accordance with General Statutes § 1-2z and our familiar principles of statutory construction. See, e.g., *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 45–46, 213 A.3d 1110 (2019). In doing so, we are mindful that the meaning of § 9-140b must, in the first instance, "be ascertained from the text of the statute itself and its relationship to other statutes." General Statutes § 1-2z.

We begin with the text of § 9-140b. Subsection (a) of § 9-140b provides the manner in which an absentee ballot must be returned to the municipal clerk's office, including by United States mail. Subsection (c) (1) defines "mailed" as "(A) sent by the United States Postal Service or any commercial carrier, courier or messenger service recognized and approved by the Secretary of the State, or (B) *deposited in a secure drop box* designated by the municipal clerk for such purpose, in accordance with instructions prescribed by the Secretary." (Emphasis added.) General Statutes § 9-140b (c) (1). Subsection (c) (2) provides that, "[i]n the case of absentee ballots mailed under subparagraph (B) of subdivision (1) of this subsection, beginning on the twenty-ninth day before each election, primary or referendum, and on each weekday thereafter until the close of the polls at such election, primary or referendum, *the municipal clerk shall retrieve* from the secure drop box described in said subparagraph each such ballot deposited in such drop box." (Emphasis added.) General Statutes § 9-140b

Cohen *v.* Rossi

(c) (2). "Municipal clerk" is defined in title 9 of the General Statutes simply as "the town clerk in or for the municipality to which reference is made, unless otherwise provided by charter or special act." General Statutes § 9-1a; see also General Statutes § 9-1 (g) (defining "[m]unicipal clerk" as "the clerk of a municipality").

The plain language of § 9-140b appears to require the municipal clerk to personally retrieve the absentee ballots from each secure drop box. We note, however, that, when § 9-140b is viewed in relationship to other related statutes, it is clear that the clerk may designate tasks to his or her designees. There are numerous responsibilities assigned to the "municipal clerk" throughout the absentee ballot statutes, and none of them references the clerk's designee or the clerk's assistants. See, e.g., General Statutes § 9-135a (b) (requiring municipal clerk to prepare modified absentee ballot in situations in which offices are to be voted on without party designation); General Statutes § 9-135a (c) (requiring municipal clerk to prepare and print separate absentee ballots for unaffiliated electors); General Statutes § 9-135b (a) (requiring municipal clerk to prepare absentee ballots and to have them printed); General Statutes § 9-135b (c) (requiring municipal clerk to file printed absentee ballot and affidavit stating number of ballots printed with Secretary of the State); General Statutes § 9-140 (a) (requiring municipal clerk to accept applications for absentee ballots and to maintain log of absentee ballot applications); General Statutes § 9-140 (c) (requiring municipal clerk to check name of each absentee ballot applicant against registry list and to send applicants notice if name does not appear on list); General Statutes § 9-140 (e) (requiring municipal clerk, upon receipt of absentee ballot application, to write serial number of absentee ballot voting set on application form, to issue voting sets to applicants in

Cohen *v.* Rossi

consecutive ascending order, and to maintain list of numbers and corresponding applicants); General Statutes § 9-140 (g) (requiring municipal clerk to mail absentee voting sets to applicants in accordance with prescribed timelines); General Statutes § 9-140 (i) (requiring municipal clerk to file executed applications in alphabetical order of applicant); General Statutes § 9-140c (a) (requiring municipal clerk to retain absentee ballot envelopes, to endorse each envelope over his signature with date and precise time of its receipt, to make affidavit attesting to accuracy of all such endorsements, and to deliver such affidavit, at close of polls, to head moderator, who will endorse it and return it for clerk to preserve for 180 days); General Statutes § 9-140c (b) (allowing municipal clerk to sort absentee ballots into voting districts in accordance with prescribed timelines); General Statutes § 9-140c (d) (requiring municipal clerk to seal unopened ballots in package and to retain them in safe place); General Statutes § 9-140c (e) (requiring municipal clerk to receive certain absentee ballots, to deliver certain ballots to registrars of voters, and to provide accompanying duplicate checklist to registrars); General Statutes § 9-140c (f) (requiring municipal clerk to sort certain absentee ballots into voting districts and to retain ballots until they are delivered to registrars of voters); General Statutes § 9-140c (g) (requiring municipal clerk to deliver certain absentee ballots to registrars of voters).

Moreover, other references in the General Statutes indicate that the legislature contemplated that the municipal clerk will delegate tasks to his or her designees and is authorized to do so. For example, General Statutes § 7-19 provides in relevant part that "[e]ach town clerk may, unless otherwise provided by charter or ordinance, appoint assistant town clerks, who, having taken the oath provided for town clerks, shall, in the absence or inability of the town clerk, have all the

Cohen *v.* Rossi

powers and perform all the duties of the town clerk.
. . .''[5] Section 9-140b itself suggests that someone other
than the municipal clerk properly could receive and
process absentee ballots. Specifically, subsection (d)
of § 9-140b provides in relevant part that ''[n]o person
shall have in his possession any official absentee ballot
or ballot envelope . . . except . . . *any person
authorized by a municipal clerk to receive and process
official absentee ballot forms on behalf of the munici-
pal clerk,* any authorized primary, election or referen-
dum official or any other person authorized by any
provision of the general statutes to possess a ballot or
ballot envelope.'' (Emphasis added.) Retrieving absen-
tee ballots from the drop boxes certainly constitutes
''receiv[ing] and process[ing]'' absentee ballots. Accord-
ingly, we conclude that, when read in the context of
the entire absentee ballot statutory scheme, § 9-140b
(c) (2) requires the municipal clerk, or his or her desig-
nee, to retrieve the absentee ballots from each secure
drop box.

Although we need not look to the legislative history
of the statute given our conclusion that the plain mean-
ing of the statute requires the municipal clerk or his
or her designee to retrieve the absentee ballots, we
acknowledge that the plaintiff's primary argument on
appeal relies on the fact that General Statutes (Rev. to
2021) § 9-140b (c) (2) was amended by the legislature
during a special session in June, 2021. See Spec. Sess.
P.A. 21-2, § 102. That subdivision previously provided
in relevant part: ''In the case of absentee ballots mailed
under subparagraph (B) of subdivision (1) of this sub-
section . . . the municipal clerk shall (A) retrieve from

_____

[5] We note that Horvath was not present in the City Clerk's Office on election
day. As a result, the retrieval of ballots from the drop boxes on election day
by an assistant clerk would plainly be permissible under § 7-19 because that
statute permits assistant municipal clerks to perform all the duties of the
municipal clerk in the absence of the municipal clerk.

666 JUNE, 2023 346 Conn. 642

Cohen *v.* Rossi

the secure drop box described in said subparagraph each such ballot deposited in such drop box, and (B) *if the drop box is located outside a building other than the building where the clerk's office is located, arrange for the clerk or the clerk's designee to be escorted by a police officer during such retrieval.*" (Emphasis added.) General Statutes (Rev. to 2021) § 9-140b (c) (2). The plaintiff contends that the legislature modified the statute to exclusively permit the municipal clerk herself to retrieve absentee ballots from the drop boxes when it deleted the language permitting the clerk's designee to retrieve absentee ballots with the assistance of a police officer. Even if we were to agree with the plaintiff that it is appropriate to look to the legislative history of the statute, we are not persuaded that the plaintiff's reading of the statute is correct.

First, the plaintiff's interpretation of the statute improperly ignores the requirement of § 1-2z that the meaning of the statute shall "be ascertained from the text of the statute itself and *its relationship to other statutes.*" (Emphasis added.) General Statutes § 1-2z. The plaintiff fails to reconcile § 9-140b (c) (2) with the broader statutory scheme pertaining to the absentee ballot process, which plainly contemplates that the municipal clerk will delegate tasks to his or her designees and is authorized to do so.

Second, it would be implausible to conclude that the municipal clerk is required to retrieve all absentee ballots from the drop boxes herself simply because there is no mention of a clerk's designee. Such a reading would also require the clerk to carry out nearly the entire absentee ballot process without the help of anyone in her office because the other relevant statutory provisions do not reference a designee. As we explained, there are numerous statutes governing the absentee ballot process, and none of them references the municipal clerk's designee or assistant. Many municipalities

have multiple drop boxes—West Haven had three—and the municipal clerk must ensure that all ballots are accepted before the close of polls. It would be virtually impossible for the municipal clerk to personally ensure all ballots are received before the close of polls when there are multiple drop boxes located throughout the municipality. Requiring a single person to carry out the entire absentee ballot procedure under such circumstances, without any assistance, would grind the administration of an election nearly to a halt. The legislature could not have intended such an implausible result. Cf. *Wilkins* v. *Connecticut Childbirth & Women's Center*, 314 Conn. 709, 723, 104 A.3d 671 (2014) ("[i]t is axiomatic that [w]e must interpret the statute so that it does not lead to absurd or unworkable results" (internal quotation marks omitted)).

The plaintiff would have a stronger argument that the legislature intended to remove the ability of the municipal clerk to designate someone to pick up the ballots if the only change to the statute was that the legislature removed the "or the clerk's designee" language and not the entirety of General Statutes (Rev. to 2021) § 9-140b (c) (2) (B). Subparagraph (B), which was deleted in its entirety, required a police officer to escort the clerk or his or her designee when that person retrieved ballots from certain drop boxes. The bill analysis of Senate Bill No. 1202, the bill that amended General Statutes (Rev. to 2021) § 9-140b (c) (2), provides the following context as to the purpose of the amendment: "The bill eliminates a requirement that applied during the 2020 state election under which a police officer had to escort the [municipal] clerk in retrieving absentee ballots from any drop box located outside of a building other than the clerk's office building. The bill also makes technical and conforming changes." Office of Legislative Research, Bill Analysis for Senate Bill No. 1202, as amended by House "A," House "G," House "H,"

Cohen *v.* Rossi

and Senate "A," An Act Concerning Provisions Related to Revenue and Other Items To Implement the State Budget for the Biennium Ending June 30, 2023 (2021) p. 100, available at https://www.cga.ct.gov/2021/BA/PDF/ 2021SB-01202-R02SS1-BA.PDF (last visited June 9, 2023). "Although the comments of the [O]ffice of [L]egislative [R]esearch are not, in and of themselves, evidence of legislative intent, they properly may bear on the legislature's knowledge of interpretive problems that could arise from a bill." *Harpaz* v. *Laidlaw Transit, Inc.*, 286 Conn. 102, 124 n.15, 942 A.2d 396 (2008). In the absence of express language in the statute requiring the municipal clerk to perform the task herself, we decline to interpret the legislature's deletion of this language to mean that only the clerk may carry out the directive, insofar as the legislature may have removed this language because it was unnecessary in light of the entire absentee ballot statutory scheme. We are unpersuaded that the purpose of the amendment was to remove the language that acknowledged that the municipal clerk may designate someone to retrieve the ballots.

Here, Horvath delegated the responsibility of retrieving the absentee ballots from the secure drop boxes to her subordinates about "[h]alf the time . . . ." There is no allegation that someone outside the City Clerk's Office retrieved the ballots. Therefore, we conclude that the defendants complied with the statute, and there is no error in the ruling of an election official for purposes of § 9-328.

II

FOURTEEN "SAME DAY" ABSENTEE BALLOTS

We next turn to the plaintiff's two claims concerning the fourteen "same day" absentee ballots that he argues were improperly counted because they (1) failed to substantially comply with § 9-140c (a), insofar as they were not endorsed by Horvath, the city clerk, at the

time they were received, and (2) were treated differently from other, similarly situated ballots.

The following additional facts are relevant to these claims. There was testimony throughout the hearing before the trial court that twelve to fifteen absentee ballots that had been retrieved from three drop boxes in West Haven on election day were delivered by the registrars of voters to the central counting room at approximately 5:30 p.m. The parties ultimately agreed that there were actually fourteen such "same day" ballots. The head absentee ballot moderator, Catherine Conniff, asked the registrars to hold these ballots until the count was complete because they needed to be divided into districts and checked against the official books for each district. The ballots were brought back to the central counting room before 8 p.m. for counting, and it was discovered that they did not contain Horvath's endorsement.

Election officials agreed that they should contact the Office of the Secretary of the State to seek guidance on how to handle these ballots. Conniff and the Democratic registrar of voters of West Haven, Sherri Lepper, called the Office of the Secretary of the State and reached Heather Augeri. Once it was confirmed that the ballots had been received by the City Clerk's Office no later than 3 p.m. on election day, the election officials were advised to have the assistant city clerk, Recchia, endorse the ballots by hand and to count them. Recchia did as instructed, and the outer envelopes of these ballots were hand marked, "[r]ec'd SR 3:00 p.m." The outer envelopes were also stamped, "NOV—2 2021." The election officials then returned to the counting room with the ballots, and they were counted. A document titled "Affidavit of Delivery and Receipt of Absentee Ballot" was signed by Recchia and Lepper, and delivered to Conniff.

The trial court reasoned that, although strict compliance with § 9-140c (a) was plainly lacking because Hor-

Cohen *v.* Rossi

vath did not endorse these ballots at the time of receipt and the City Clerk's Office did not follow its customary procedure of marking the ballots with a stamp, only substantial compliance with the statute was required. The court concluded that the evidence was undisputed that, after election officials conferred with an employee at the Office of the Secretary of the State, Recchia endorsed the fourteen unendorsed outer envelopes, and those endorsements substantially complied with § 9-140c (a).

A

The plaintiff first claims that the trial court incorrectly concluded that the fourteen "same day" absentee ballots substantially complied with § 9-140c (a), in the absence of any statutory compliance by Horvath. Specifically, the plaintiff contends that the evidence demonstrated that these ballots were not returned to the City Clerk's Office, as required by statute; rather, they were returned to the Office of the Registrar of Voters before going to the City Clerk's Office. As a result, the plaintiff contends, the City Clerk's Office did not endorse the ballots at the time they were received, as required by § 9-140c (a). Instead, those ballots were endorsed hours after they were received. The defendants contend that the trial court correctly determined that the fourteen "same day" ballots substantially complied with § 9-140c (a) because, although they were not initially endorsed, they were ultimately endorsed by Recchia after it was confirmed that they were properly received on election day from eligible absentee ballot voters. We agree with the defendants.

Section 9-140c (a) provides in relevant part: "The municipal clerk shall endorse over his signature, upon each outer envelope as he receives it, the date and precise time of its receipt. . . ." We have previously explained that "[t]he provisions of § 9-140c (a) regard-

Cohen *v.* Rossi

ing the date and time of the [municipal] clerk's receipt of an absentee ballot envelope, and the [municipal] clerk's signature, are mandatory because they are designed to mitigate the risk of fraud that is inherent in the absentee voting process. . . . That does not mean, however, that strict, as opposed to substantial, compliance with those provisions is required. Rather, there must be substantial compliance with the statutory requirements.'' (Citation omitted.) *In re Election of the United States Representative for the Second Congressional District*, 231 Conn. 602, 651, 653 A.2d 79 (1994).

In *In re Election of the United States Representative for the Second Congressional District*, this court addressed irregularities in the handling of absentee ballots in Stonington, Old Saybrook, Ledyard, and Norwich. Id., 648. In each city or town, the clerk's office had a stamp that it typically used on absentee ballot outer envelopes as the ballots arrived. Id., 649–50. The plaintiff challenged 413 absentee ballot outer envelopes that were endorsed as follows. In Stonington, the outer envelope entered into evidence was stamped: ''RECEIVED FOR RECORD STONINGTON, CT. 94 NOV—8 AM 9:55 RUTH WALLER TOWN CLERK.'' (Internal quotation marks omitted.) Id., 649. Three absentee ballot outer envelopes in Old Saybrook were stamped: ''RECEIVED OCTOBER 14 1994.'' (Internal quotation marks omitted.) Id. In Ledyard, although the town clerk had a stamp facsimile of her cursive signature that she customarily affixed to each outer envelope upon receipt, six outer envelopes lacked that cursive facsimile because the ballots arrived when the clerk was recovering from heart surgery and was out of the office. Id., 650. The clerk's assistant failed to affix the clerk's cursive facsimile, and the envelopes were stamped: ''RECEIVED FOR RECORD AT LEDYARD, CT. 94 OCT 26 AM 10:31 ATTEST: PATRICIA KARNS TOWN CLERK.'' (Internal quotation marks omitted.) Id. In Norwich, the clerk

Cohen *v.* Rossi

had a stamp facsimile of her cursive signature that she customarily used, but the evidence established that one outer envelope lacked that cursive facsimile and was stamped: "RECEIVED 94 NOV—7 AM 9:03 BEVERLY C. MULDOON TOWN-CITY CLERK NORWICH, CONN." (Internal quotation marks omitted.) Id.

In addressing the plaintiff's claims that the 413 ballots did not comply with § 9-140c (a), this court reasoned that "[t]he purpose of the signature requirement in § 9-140c (a) is to avoid fraud in the voting of absentee ballots. By requiring the [municipal] clerk to sign the outer envelope, the statute seeks to avoid the risk that an unauthorized person will somehow include an unauthorized absentee ballot among those validly sent and delivered." Id., 652. We also noted, however, that this consideration must be weighed against the numerous procedural rigors in the statutory scheme governing absentee ballots that act as a significant safeguard against fraud. Id. This court explained that courts should also consider "the extent of deviation from strict compliance" when deciding whether there has been substantial compliance. Id., 652–53. Finally, we also explained that courts should take into consideration whether the failure of strict compliance was due to the conduct of the voter or of someone not within his or her control. Id., 653. In sum, we concluded that "whether [an anomalous endorsement] constitute[s] substantial compliance with § 9-140c (a) . . . must be determined by reference to the purpose of the statutory requirement, the role played by the requirement viewed in the context of the statutory scheme, the degree of adherence to strict compliance shown, and the basic policy against disfranchisement of voters who are not at fault for any lack of strict compliance" by election officials. Id., 652.

In *In re Election of the United States Representative for the Second Congressional District*, this court determined that, of the 413 absentee ballot outer envelopes

Cohen *v.* Rossi

at issue in that case, the 3 absentee ballots from Old Saybrook were the only ballots that did not substantially comply with § 9-140c (a). Id., 651–52. This court explained that "[t]he stamp on the Old Saybrook envelopes is merely a generic date stamp and contains no indication, whether by hand signature, stamp facsimile or printed name and title, that it was received by the town clerk. Furthermore, there is no time of receipt indicated on the stamp, as required by the statute. . . . The minimal adherence to the requirements of § 9-140c (a) evinced by the endorsements on the three Old Saybrook envelopes in question leads us to conclude that they do not substantially comply with the requirements of § 9-140c (a)." (Citation omitted.) Id., 653. We concluded that the remaining ballots did substantially comply with § 9-140c (a), reasoning that, "[a]lthough a stamped facsimile of the town clerks' cursive signature would arguably have been preferable, we cannot ascribe critical significance to the difference between such a cursive facsimile and the printed names and titles of the town clerks that were rendered on the envelopes by the town clerks' time and date stamp machines. Neither of these types of stamps is readily available to the public." Id.

Here, there is no dispute that the election officials failed to strictly comply with the mandates of § 9-140c (a): Horvath did not endorse the fourteen "same day" absentee ballots herself when they were received using the date and time stamp with her signature that the City Clerk's Office customarily used. Nevertheless, as the trial court correctly noted, substantial compliance with § 9-140c (a) is all that was required. Horvath testified that she was not in the City Clerk's Office at all on election day, so she could not have personally endorsed the outer envelopes of those ballots. Section 7-19 provides in relevant part that "assistant town clerks . . . shall, in the absence or inability of the town clerk,

Cohen *v.* Rossi

have all the powers and perform all the duties of the town clerk. . . .'' As such, Recchia, as the assistant city clerk, was the highest ranking election official present and was permitted to endorse the absentee ballots received on election day.

With respect to the manner in which Recchia endorsed the ballots, she did not follow the customary practice of marking the ballots with the stamp that included a facsimile of Horvath's signature. Recchia did, however, endorse the ballots with her own handwritten initials, as well as the date and approximate time that the City Clerk's Office received the ballots. Recchia's endorsement of the fourteen ''same day'' absentee ballots is more similar to the 410 endorsements in *In re Election of the United States Representative for the Second Congressional District* that this court concluded substantially complied with § 9-140c (a) than the 3 rejected endorsements that contained only a generic date stamp. See *In re Election of the United States Representative for the Second Congressional District*, supra, 231 Conn. 649–51. In the present case, the information contained on the fourteen ''same day'' ballots—Recchia's initials, the date of receipt, and the approximate time of receipt—is nearly identical to the information required by § 9-140c (a). See General Statutes § 9-140c (a) (''[t]he municipal clerk shall endorse over his signature, upon each outer envelope as he receives it, the date and precise time of its receipt'').

Although the plaintiff does not argue that Recchia's initials do not satisfy the signature requirement of the statute, we note that Recchia's initials were written in her own handwriting, and, as this court reasoned in *In re Election of the United States Representative for the Second Congressional District* with respect to stamps, it would be difficult, in the absence of forgery, for an unauthorized person to somehow include an unautho-

Cohen *v.* Rossi

rized absentee ballot.[6] See *In re Election of the United States Representative for the Second Congressional District*, supra, 231 Conn. 652. Moreover, the slight delay between the receipt of the ballots and Recchia's endorsements thereon was attributable to the time it took for election officials to obtain guidance from the Office of the Secretary of the State—Recchia affixed her endorsements after she confirmed with election officials that these ballots were received on election day during a sweep of the absentee ballot drop boxes. The plaintiff does not allege that anyone tampered with the ballots or that they were otherwise invalid, aside from the failure to strictly comply with § 9-140c (a). Indeed, on this record, the possibility of fraudulent activity with respect to the fourteen "same day" absentee ballots seems particularly fanciful in light of (1) the evidence from the absentee ballot report, which showed that these ballots were from eligible voters and were properly delivered on election day prior to the close of polls, and (2) Recchia's sworn testimony that the handwritten initials on each ballot are her initials and that she personally wrote them on each outer envelope. The trial court also concluded that any concern of fraud was further ameliorated by the 11 a.m. barcode scan of each of the fourteen envelopes.

Finally, the strong public policy against disenfranchising voters who are not at fault for problems with

---

[6] As the trial court noted, the legislature has not defined "signature" in the absentee ballot context. It has, however, addressed signatures in another section of title 9 of the General Statutes. See General Statutes § 9-453m ("[t]he use of titles, *initials* or customary abbreviations of given names by the signer of a nominating petition shall not invalidate such signature if the identity of the signer can be readily established by reference to the signature on the petition and the name of a person as it appears on the last-completed registry list at the address indicated or of a person who has been admitted as an elector since the completion of such list" (emphasis added)). Here, Recchia was readily identifiable from her initials, and she authenticated her initials on these ballots in court.

Cohen *v.* Rossi

their ballots also strongly militates against rejecting these ballots. Although we recognize that there was a lack of "punctilious adherence" to certain statutory safeguards relating to these ballots; id.; we conclude that Recchia's endorsements substantially complied with § 9-140c (a).

B

The plaintiff also claims that the trial court's inclusion of the fourteen "same day" absentee ballots in the vote count created disparate treatment among similarly situated ballots. Specifically, he claims that the trial court, in counting these fourteen ballots, "ignored its finding that the absentee ballot counters rejected ballots earlier in the vote count that lacked [Horvath's] endorsement." The defendants contend that the trial court did not disparately treat similarly situated ballots. We conclude that the plaintiff has failed to establish that the fourteen "same day" absentee ballots were similarly situated to other rejected ballots.

The plaintiff points to two sources of support for his contention that the trial court treated the fourteen "same day" absentee ballots differently from other, similarly situated ballots. First, he references a single sentence in the trial court's memorandum of decision in which the court summarized the evidence presented in the plaintiff's case-in-chief. There, the trial court noted that an absentee ballot counter, Linda McDonough, testified that she "rejected absentee ballots in the initial count that lacked [Horvath's] endorsement." Second, the plaintiff cites testimony from Conniff, who testified that the City Clerk's Office rejected nine absentee ballots on election day and that "some of those rejected ballots *could have been* rejected due to the ballots' lacking [Horvath's] endorsement." (Emphasis added.) Without citing any additional evidence in the record, the plaintiff asserts that the fourteen "same day" absentee

ballots were treated differently from the allegedly similarly situated ballots referenced by McDonough and Conniff. We disagree.

The trial court made no factual findings that the ballots referenced by McDonough and Conniff were similarly situated to the fourteen "same day" absentee ballots. We do not know why each of these other ballots was rejected. Conniff's testimony does not even definitively establish that any of the nine rejected ballots she references were in fact rejected for lack of Horvath's endorsement. Rather, Conniff simply testified that they "*could* have been" rejected for that reason. (Emphasis added.) McDonough testified that she rejected an unspecified number of ballots that lacked Horvath's endorsement. We do not know, however, the details surrounding these ballots. As we explained in part II A of this opinion, the "same day" absentee ballots were ultimately endorsed by Recchia after she confirmed with other election officials that the ballots were from eligible voters and were properly delivered on election day prior to the close of polls. We have no such information about the ballots referenced by McDonough. We do not know, for example, whether Recchia was unable to confirm whether the ballots referenced by McDonough were from eligible voters and properly delivered to the City Clerk's Office. It was the plaintiff's burden to establish that, as a result of substantial statutory violations, the reliability of the results of the election is seriously in doubt. See, e.g., *Bortner* v. *Woodbridge*, supra, 250 Conn. 258; see also, e.g., *Lazar* v. *Ganim*, Superior Court, judicial district of Fairfield, Docket No. FBT-CV-19-6090047-S (November 1, 2019) (election case explaining that "factual findings cannot be based on speculation or conjecture"), aff'd, 334 Conn. 73, 220 A.3d 18 (2019). The plaintiff failed to establish the circumstances surrounding the rejection of these other absentee ballots, and, therefore, he cannot establish that the trial court treated the fourteen "same day" ballots

Cohen *v.* Rossi

differently from the ballots referenced by McDonough and Conniff. We decline to overturn an election on the basis of theoretical arguments without any evidence regarding the circumstances surrounding these other rejected ballots.

### III

### AFFIDAVIT OF DELIVERY AND RECEIPT

Next, we turn to the plaintiff's contention that the trial court erred in concluding that the affidavit of delivery and receipt required by § 9-140c (j) is secondary to the municipal clerk's endorsement. Specifically, the plaintiff contends that the purpose of the affidavit of delivery and receipt is to confirm that the chain of custody between the clerk and the registrars of voters was maintained and to verify an accurate absentee ballot count. In the absence of the affidavit required by § 9-140c (j), the plaintiff contends, there is no credible way to determine the number of absentee ballots returned in the election. The defendants disagree and contend that the trial court correctly concluded that the absence of the affidavit of delivery and receipt is not, by itself, sufficient reason to question the election results. The defendants contend that these affidavits serve to memorialize the transfer of custody of the absentee ballots from the municipal clerk to the registrars of voters. As a result, the defendants contend, these affidavits simply memorialize the primary evidence of the chain of custody that is established by the ballots themselves, other internal reports, and endorsements prepared by the municipal clerk. We agree with the defendants.

The following additional facts are relevant to this claim. Deborah Collins, an absentee ballot counter, testified that she was not aware of any affidavits executed with respect to absentee ballots in the election. Horvath testified that the City Clerk's Office did not execute

Cohen *v.* Rossi

affidavits of delivery and receipt when it transferred absentee ballots for the election to the Office of the Registrar of Voters.[7] As a result, the trial court concluded that there was a clear violation of § 9-140c (j), which was enacted to prevent fraud in the absentee ballot process by establishing chain of custody procedures. The court noted, however, that it heard testimony from all the election officials who had failed to prepare and execute the statutorily mandated affidavits. The court credited the testimony from these officials and concluded that this testimony established that there was no mistake in the vote count. Accordingly, the court concluded that, because the affidavits are secondary evidence to the city clerk's endorsements, it would not reject these absentee ballots on the basis of Horvath's neglect in failing to execute the affidavits of delivery and receipt.

Section 9-140c (e) directs the municipal clerk to deliver the absentee ballots to the registrars of voters for counting. Section 9-140c (j) provides that, "[e]ach time absentee ballots are delivered by the clerk to the registrars pursuant to this section, the clerk and registrars shall execute an affidavit of delivery and receipt stating the number of ballots delivered. The clerk shall preserve the affidavit for the period prescribed in section 9-150b." General Statutes § 9-150b (i) (2), in turn, requires the municipal clerk to preserve, as a public record, the affidavit of delivery and receipt for 180 days after the election.

Here, there is no question that Horvath and the registrars of voters failed to comply with § 9-140c (j), insofar

_____

[7] Horvath also testified that, as far as she was aware, no one prepared or executed affidavits of endorsement for the election, as required by § 9-140c (a). George M. Chambrelli IV, the head moderator of the election, testified that he did not submit an affidavit to Horvath to certify that her endorsements were accurate. On appeal, however, the plaintiff does not challenge the failure of the City Clerk's Office to execute affidavits of endorsement.

as Horvath testified that the City Clerk's Office never executed affidavits of delivery and receipt when it transferred absentee ballots to the Office of the Registrar of Voters. Election officials are required to comply with the mandates of § 9-140c (j) and all statutory requirements pertaining to the absentee ballot process because this "procedural rigor" was designed to safeguard against fraud. *In re Election of the United States Representative for the Second Congressional District*, supra, 231 Conn. 652–53; see also, e.g., 26 Am. Jur. 2d 129, Elections § 333 (2014) ("[t]he procedures required by the absentee voting laws serve the purposes of enfranchising qualified voters, preserving ballot secrecy, *preventing fraud*, and achieving a reasonably prompt determination of election results" (emphasis added)). This court previously has recognized "that there is considerable room for fraud in absentee [ballot] voting and that a failure to comply with the regulatory provisions governing absentee [ballot] voting increases the opportunity for fraud." (Internal quotation marks omitted.) *Keeley* v. *Ayala*, supra, 328 Conn. 407. As such, it is imperative that election officials comply with the affidavit requirement of § 9-140c (j). We have also explained, however, that, "[i]f there is to be [disen]franchisement, it should be because the legislature has seen fit to require it in the interest of an honest suffrage, and has expressed that requirement in unmistakable language." (Internal quotation marks omitted.) Id.

In this case, the trial court credited the testimony of the various election officials who failed to complete the affidavits of delivery and receipt. This testimony established that there was no mistake in the vote count and that the chain of custody of the ballots was properly maintained. Specifically, the court credited Horvath's testimony, which established that the City Clerk's Office and the registrars of voters transferred all absentee ballots that the City Clerk's Office received to the Office

Cohen *v.* Rossi

of the Registrar of Voters every day at the close of business. The court also noted that, throughout the hearing, multiple election officials testified to the various steps they took to maintain the chain of custody, and the plaintiff did not provide any evidence that the chain of custody was broken such that the reliability of the election results was called into question. Election officials also credibly testified that the City Clerk's Office and the Office of the Registrar of Voters reviewed the absentee ballot reports against the ballots themselves, and the number of absentee ballots matched the reports each time. On appeal, the plaintiff does not dispute the trial court's credibility determination of these witnesses or claim that the chain of custody was broken. As a result, the failure of the election officials to comply with § 9-140c (j) is overcome by their sworn testimony, credited by the trial court, which established the chain of custody for these ballots. This court has explained that a voter should not be disenfranchised because of the error or mistake of another when that mistake does not contravene the legislative policy against voting fraud. See, e.g., *Dombkowski* v. *Messier*, 164 Conn. 204, 206–207, 319 A.2d 373 (1972); *Scully* v. *Westport*, 145 Conn. 648, 651–52, 145 A.2d 742 (1958); *Moran* v. *Bens*, 144 Conn. 27, 32, 127 A.2d 42 (1956). We agree with the trial court that the plaintiff has not established that the reliability of the results of the election is seriously in doubt.

We do not reach this conclusion without reservation. We agree with the plaintiff that the trial court's statement—that the affidavit of delivery and receipt required by § 9-140c (j) is "secondary evidence" to the municipal clerk's endorsement—appears to conflate the purpose of the affidavit of delivery and receipt with the purpose of the affidavit of endorsement required by § 9-140c (a). The purpose of the affidavit of delivery and receipt is to prevent fraud in the absentee ballot process by

Cohen *v.* Rossi

establishing the chain of custody of the ballots. By con-
trast, the purpose of the affidavit of endorsement is to
verify the endorsements the municipal clerk is required
to make on the outer envelopes of absentee ballots
pursuant to § 9-140c (a). Additionally, the affidavits are
not "secondary evidence" to the endorsements. The affida-
vits are statutorily mandated by the legislature, and com-
pliance is therefore mandatory, not optional. Indeed, this
case highlights the problems that can arise when a munici-
pality does not comply with the mandates of § 9-140c (j);
namely, the municipality faces the possibility of litigation
and is left to establish the chain of custody through the
testimony of election officials. The affidavits of delivery
and receipt are intended to avoid the need for such testi-
mony by providing contemporaneous documentation of
the chain of custody of the absentee ballots each time
the municipal clerk delivers the ballots to the registrars
of voters. The need to litigate the proper chain of custody
of absentee votes on a ballot-by-ballot basis is clearly
untenable at a systemic level, and local election officials
must satisfy their statutory obligation to follow the pre-
scribed administrative procedures to avoid the potentially
debilitating inefficiencies that would result from noncom-
pliance. As we explained, given the testimony of Horvath
and other election officials, we agree with the trial court
that, although the plaintiff established that the election
officials violated § 9-140c (j) by not completing the affida-
vits of delivery and receipt, he failed to establish that the
reliability of the results of the election is seriously in
doubt. But this conclusion should not obscure the vital
importance of our message to local election officials,
which is the necessity to adhere to the prescribed statu-
tory procedures without deviation. Compliance is neces-
sary, not only to maintain strong and unwavering public
confidence in our elections, but also to facilitate the
timely, efficient, and proper resolution of election disputes
that may end up in court.

Cohen *v.* Rossi

IV

## RETURN OF ABSENTEE BALLOTS BY IMPROPERLY DESIGNATED PERSON

The plaintiff next contends that the trial court incorrectly concluded that the absentee ballots belonging to Tomporowski, Carlington, Holland, and Arminio substantially complied with § 9-140b (a).[8] The plaintiff argues that each of these absentee ballots was returned by someone who was not statutorily authorized to do so. The defendants contend that the trial court correctly concluded that the plaintiff had failed to satisfy his burden of proving that these four absentee ballots did not substantially comply with § 9-140b (a). We agree with the defendants.

At trial, the plaintiff claimed that eleven absentee ballots were returned by an improperly designated person. The trial court agreed with the plaintiff regarding six of the challenged ballots but found that "five absentee ballot outer envelopes [including those belonging to Tomporowski, Carlington, Holland, and Arminio] contain[ed] the information that § 9-140b (a) requires. . . . The plaintiff has not provided evidence that the designees for these absentee ballot voters are not qualified designees under § 9-140b (a) (3) or (4). Without such proof, the plaintiff has failed to carry his burden of proving that these absentee ballots were submitted in violation of § 9-140b." (Footnote omitted.)

Section 9-140b (a) provides in relevant part: "An absentee ballot shall be cast at a primary, election or referendum only if: (1) It is mailed by (A) the ballot applicant, (B) a designee of a person who applies for an absentee ballot because of illness or physical disability, or (C) a member of the immediate family of an applicant who is a student, so that it is received by the clerk of the municipality in

---

[8] Additionally, the plaintiff previously challenged the absentee ballot belonging to Lesley Bode. On appeal, however, the plaintiff no longer challenges Bode's ballot.

which the applicant is qualified to vote not later than the close of the polls; (2) it is returned by the applicant in person to the clerk by the day before a regular election, special election or primary or prior to the opening of the polls on the day of a referendum; (3) it is returned by a designee of an ill or physically disabled ballot applicant, in person, to said clerk not later than the close of the polls on the day of the election, primary or referendum; (4) it is returned by a member of the immediate family of the absentee voter, in person, to said clerk not later than the close of the polls on the day of the election, primary or referendum . . . . A person returning an absentee ballot to the municipal clerk pursuant to subdivision (3) or (4) of this subsection shall present identification and, on the outer envelope of the absentee ballot, sign his name in the presence of the municipal clerk, and indicate his address, his relationship to the voter or his position, and the date and time of such return. As used in this section, 'immediate family' means a dependent relative who resides in the individual's household or any spouse, child, parent or sibling of the individual.''

As we have previously explained, ''the requirements of § 9-140b are mandatory. . . . Accordingly, the return of ballots in a manner not substantially in compliance with § 9-140b will result in their invalidation, regardless of whether there is any proof of fraud.'' (Citation omitted.) *Keeley* v. *Ayala*, supra, 328 Conn. 410–11. In *Keeley*, this court noted that ''[§] 9-140b, read as a whole, reflects a clear legislative intent to maintain distance between partisan individuals and the casting and submission of absentee ballots, undoubtedly in recognition of the potential for undue influence, intimidation or fraud in the use of those ballots.'' Id., 411. This court further observed that, ''[w]ith respect to who may choose a 'designee' for an absentee voter, the language used in § 9-140b manifests [a legislative intention] that a 'designee' be a person whom the absentee voter, himself or herself, selects to return

Cohen *v.* Rossi

his or her ballot. Specifically, that statutory provision indicates that 'a *designee of an* ill or physically disabled *ballot applicant*' may return the ballot in person . . . General Statutes § 9-140b (a) (3); and otherwise that '*a designee of a person* who applies for an absentee ballot because of illness or physical disability' may return the ballot by mail. . . . General Statutes § 9-140b (a) (1) (B)." (Emphasis in original.) *Keeley* v. *Ayala*, supra, 412.

Here, the plaintiff failed to subpoena these voters or the individuals who delivered their ballots. The plaintiff also did not question anyone from the City Clerk's Office regarding the process of accepting an absentee ballot from a designee or an immediate family member. There is also no evidence to suggest that the City Clerk's Office failed to perform its duties of having a designee or family member sign his or her name in the clerk's presence and of checking the identification of the designee or family member. Rather, the plaintiff relies exclusively on the outer envelopes to establish his case. This evidence alone cannot establish that the designees who returned the ballots were not qualified designees under § 9-140b (a). For example, there is no information regarding whether any of these voters were ill or physically disabled and, therefore, allowed to designate someone to return their ballot pursuant to § 9-140b (a) (1) or (3). There is also no evidence that certain designees were not "immediate family," as that term is defined. See General Statutes § 9-140b (a) ("[a]s used in this section, 'immediate family' means a dependent relative who resides in the individual's household or any spouse, child, parent or sibling of the individual"). Moreover, the trial court found, as a matter of fact, that these absentee ballot outer envelopes contained the information required by § 9-140b (a). We cannot conclude that this finding was clearly erroneous. See, e.g., *Bortner* v. *Woodbridge*, supra, 250 Conn. 258 ("underlying facts are to be established by a preponderance of the evidence and are subject on appeal to the clearly erroneous stan-

Cohen *v.* Rossi

dard''); see also, e.g., Practice Book § 60-5 (''[t]he court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous''). Had the plaintiff wished to establish the relationships and circumstances surrounding the return of these absentee ballots, he could have requested the absentee ballot applications for each voter or subpoenaed these individuals to testify. He did not. Accordingly, we agree with the trial court that the plaintiff failed to satisfy his burden of proving that these absentee ballots were submitted in violation of § 9-140b (a).

V

ABSENTEE BALLOT REPORT

We next address the plaintiff's contention that the trial court incorrectly concluded that the eight absentee ballot outer envelopes found in the city vault that were missing from the absentee ballot report were returned to the City Clerk's Office in substantial compliance with § 9-140b (a). Specifically, the plaintiff argues that the evidence revealed that a comparison of the outer envelopes against the absentee ballot report dated November 3, 2021, shows that there were 8 absentee ballot outer envelopes included within the 711 outer envelopes of counted absentee ballots that were not logged as returned in the November 3, 2021 absentee ballot report. The plaintiff also notes that a similar comparison against the December 2, 2021 absentee ballot report shows that only 2 of the 8 absentee ballots appear logged. As a result, it is the plaintiff's contention that, as of thirty days following the election, there was no record of 6 counted absentee ballots being returned to the City Clerk's Office. The defendants disagree and contend that the trial court correctly concluded that the plaintiff failed to satisfy his burden of proving that these ballot envelopes found in the city vault were not returned to the City Clerk's Office in substantial compliance with § 9-140b (a).

Cohen *v.* Rossi

Relevant to this claim, the trial court explained that the eight absentee ballots found in the city vault that were missing from the absentee ballot report are not evidence of noncompliance with the absentee ballot statutory requirements. The court noted that the primary evidence of returned absentee ballots is the § 9-140c (a) requirement that the municipal clerk mark each outer envelope as the municipal clerk's office receives it with her endorsement and the precise date and time of receipt. The court also noted that the plaintiff did not present any evidence that the outer envelopes of these eight absentee ballots lacked the clerk's § 9-140c (a) certification. Accordingly, the court concluded that it would "not overturn an election on theoretical arguments without any evidentiary basis. The plaintiff bears the burden of proving that there was a mistake in the count of the vote, and he cannot rely on mere conjecture to meet that burden." We agree with the trial court.

Section 9-140c (a) requires, among other things, that the municipal clerk "keep a list of the names of the applicants who return absentee ballots to the clerk under section 9-140b. The list shall be preserved as a public record as required by section 9-150b." In this case, the evidence demonstrated a discrepancy of eight ballots that were not included in the November 3, 2021 absentee ballot report but were in the city vault. The plaintiff failed to present any evidence to the trial court, however, that the outer envelopes of these ballots lacked the clerk's § 9-140c (a) endorsement, and he does not contend otherwise on appeal. "[U]nder our system of government, the plaintiff bears the *heavy burden* of proving by a preponderance of the evidence that any irregularities in the election process *actually, and seriously, undermined the reliability of the election results* before the courts will overturn an election." (Emphasis altered.) *Caruso* v. *Bridgeport*, 285 Conn. 618, 653, 941 A.2d 266 (2008). As the trial court concluded, the plaintiff failed to meet the heavy burden

Cohen *v.* Rossi

of establishing that these eight absentee ballots should be invalidated because they were not entered into the November 3, 2021 absentee ballot report. In the absence of evidence that these ballots did not otherwise comply with the requirements of §§ 9-140b and 9-140c (a), we decline to disenfranchise these voters because of a discrepancy in the absentee ballot report. Contrary to the plaintiff's assertion, there is a record of these ballots being returned to the City Clerk's Office—Horvath's endorsement on each outer envelope. Accordingly, we cannot conclude that the counting of these ballots was a mistake of an election official.

We emphasize, however, that election officials must take care to comply with all statutory requirements pertaining to the absentee ballot process, including maintaining an accurate list of the names of applicants who return absentee ballots, as required by § 9-140c (a). As we explained in part III of this opinion, the requirements of the absentee ballot statutory scheme were designed to safeguard against fraud. See, e.g., *In re Election of the United States Representative for the Second Congressional District*, supra, 231 Conn. 652–53; see also, e.g., 26 Am. Jur. 2d, supra, § 333, p. 129. When election officials fail to comply with the various statutory mandates, the risk of fraud increases, and the municipality faces the risk of litigation and the burdens of establishing the integrity of the electoral process and of demonstrating that the reliability of the results of the election is not seriously in doubt.

VI

MISCELLANEOUS CLAIMS

Finally, the plaintiff contends, in his brief, that the trial court incorrectly concluded that the reliability of the results of the election was not in serious doubt and that there was no mistake in the vote count. In this section of his brief, the plaintiff points to "[a]dditional evidence"

Cohen *v.* Rossi

that he asserts further supports his contention that the reliability of the results of the election is in serious doubt. To the extent the plaintiff is raising new claims with respect to this "[a]dditional evidence" that we have not already addressed in parts I through V of this opinion, we conclude that these claims are inadequately briefed. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [When] a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned. . . . For a reviewing court to judiciously and efficiently . . . consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . In addition, briefing is inadequate when it is not only short, but confusing, repetitive, and disorganized." (Citations omitted; internal quotation marks omitted.) *Burton* v. *Dept. of Environmental Protection*, 337 Conn. 781, 803, 256 A.3d 655 (2021). Here, the plaintiff provides no legal analysis or legal support with respect to the "[a]dditional evidence" he mentions in this section of his brief. The plaintiff's cursory assertions of the various alleged discrepancies leave this court unable to ascertain exactly what alleged error the plaintiff is claiming with respect to some of this "[a]dditional evidence . . . ." In less than two pages of his brief, the plaintiff raises at least four separate instances of claimed irregularities. "Although the number of pages devoted to an argument in a brief is not necessarily determinative, relative sparsity weighs in favor of concluding that the argument has been inadequately briefed." *State* v. *Buhl*, 321 Conn. 688, 726, 138 A.3d 868 (2016). The trial court did not even address some of the "[a]dditional evidence" the plaintiff now points to in sup-

Cohen *v.* Rossi

port of his contention that the reliability of the results of the election was in serious doubt. Accordingly, we decline to review this claim.

In sum, we agree with the trial court that, with respect to certain claims of the plaintiff, "the evidence presented show[ed] a concerning lack of overall compliance with statutory guidelines by [West Haven] election officials . . . ." The failure to comply with the statutory procedures increases the risk of fraud and can affect the overall integrity of the electoral process. Election officials should use care and follow the statutory guidelines. Based on our review of the record, we conclude that, despite the lack of compliance by the election officials, the trial court correctly found that the plaintiff failed to satisfy his burden of proving that the reliability of the results of the mayoral election was seriously in doubt.

The judgment is affirmed.

In this opinion ALEXANDER and KELLER, Js., concurred.

D'AURIA, J., with whom ROBINSON, C. J., joins, concurring in part and concurring in the judgment. I agree with and join parts II through VI of the plurality opinion. Respectfully, however, I do not agree with the conclusion in part I of the plurality opinion, that the term "municipal clerk" in General Statutes § 9-140b (c) (2) plainly and unambiguously authorizes the municipal clerk *and* any of the clerk's "designees" to retrieve absentee ballots from secure drop boxes. Rather, I believe that the statute's plain and unambiguous language authorizes only the municipal clerk and, if the requirements of General Statutes § 7-19 are satisfied, any appointed assistant clerks, to retrieve absentee ballots from the drop boxes. Nonetheless, I agree with the plurality that the record before us regarding who retrieved how many absentee ballots does not permit a conclusion that any

Cohen *v.* Rossi

error affected the reliability of the result of the November, 2021 election for mayor of the city of West Haven. I therefore respectfully concur in part.

My main disagreement with the plurality concerns its application of General Statutes § 1-2z.[1] Although the plurality recites this statute when undertaking to construe the term "municipal clerk," I do not agree that the plurality has properly considered both the language of § 9-140b (c) (2) and its relationship to other related statutes. Specifically, the plurality holds that the phrase "municipal clerk" means the municipal clerk and any designee of the clerk, despite the fact that the word "designee" does not appear anywhere in the governing statutes to describe anyone whom the clerk may designate to perform any task, let alone to retrieve absentee ballots from drop boxes.[2] The plurality mainly bases its conclusion on its contention that, because so many

---

[1] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

[2] General Statutes § 9-140b (a) (1) (B) does refer to, and § 9-140b (b) does define, "designee," but only in reference to someone whom an absentee ballot applicant may designate to assist an absentee ballot applicant in voting. There is no reference in § 9-140b to a designee of the municipal clerk, although there was prior to the passage of Public Acts, Spec. Sess., June, 2021, No. 21-2, § 102. See General Statutes (Rev. to 2021) § 9-140b (c) (2) ("the municipal clerk shall . . . (B) if the drop box is located outside a building other than the building where the clerk's office is located, arrange for the clerk or the clerk's designee to be escorted by a police officer during such retrieval").

In the absence of ambiguity, however, a proper textual construction of the statute under § 1-2z does not refer to repealed language, and the plurality does not contend that it does. See *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 146, 202 A.3d 262 (vetoed bills and repealed statutes may be considered under § 1-2z to determine meaning of statute only when plain language of statute is ambiguous), cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*, U.S. , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019).

Cohen *v.* Rossi

other statutes that require the municipal clerk to undertake certain duties regarding the absentee ballot procedure only use the phrase "municipal clerk," without explicitly authorizing others to act on his or her behalf, it would be " 'absurd or unworkable' " to require the clerk to personally "carry out the entire absentee ballot procedure," which "would grind the administration of an election nearly to a halt." The plurality relies on §§ 7-19 and 9-140b (d) to support its conclusion "that the legislature contemplated that the municipal clerk [would] delegate tasks to her designees and is authorized to do so."

In my view, the plurality does not sufficiently consider the plain and unique language of each of these statutes and provisions. I believe that an appropriate § 1-2z analysis should proceed as follows. Section 9-140b (c) (2) requires "the municipal clerk [to] retrieve from the secure drop box . . . each such [absentee] ballot deposited in such drop box." General Statutes § 9-1 (g) defines "[m]unicipal clerk" as "the clerk of a municipality . . . ." General Statutes § 9-1a defines "municipal clerk" or "clerk of the municipality" as "the town clerk in or for the municipality to which reference is made, unless otherwise provided by charter or special act." I agree with the plurality that these definitions "[appear] to require the municipal clerk to personally retrieve the absentee ballots from each secure drop box."

As to the plurality's concern that requiring the municipal clerk personally to carry out nearly the entire absentee ballot procedure might be impossible, I believe that reading the text of those statutes (including § 9-140b (c) (2)) and their "relationship to other statutes" leads to a conclusion different from that of the plurality about how the legislature considered this problem and accommodated it. In my view, two statutes in particular manifest this forethought. First, regarding the clerk's duties generally, § 7-19 allows the town clerk to "*appoint* assis-

Cohen *v.* Rossi

tant town clerks, who, having taken the oath provided for town clerks, shall, in the absence or inability of the town clerk, have all the powers and perform all the duties of the town clerk.'' (Emphasis added.) Second, regarding absentee ballots specifically, § 9-140b (d) provides in relevant part: ''No person shall have in his possession any official absentee ballot or ballot envelope for use at any primary, election or referendum *except* . . . any person authorized by a municipal clerk to *receive and process official absentee ballot forms* on behalf of the municipal clerk . . . .'' (Emphasis added.)

The plurality cites to the latter provision as support for its contention that ''[§] 9-140b itself suggests that someone other than the municipal clerk properly could receive and process absentee ballots.'' When read in tandem, I draw a different conclusion than does the plurality from the plain language of §§ 7-19 and 9-140b about who may ''perform [the duty]'' of the town clerk under § 9-140b (c) (2) of ''retriev[ing] from the secure the drop box[es] . . . each such ballot deposited in such drop box.''

The plurality, without citation, simply asserts that ''[r]etrieving absentee ballots from the drop boxes certainly constitutes 'receiv[ing] and process[ing]' absentee ballots.'' Such effortless equivalence of language is possible, but not necessary or even probable, under our usual rules of interpretation. In fact, conventionally, we presume that the legislature's use of ''different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings . . . .'' (Internal quotation marks omitted.) *Celentano* v. *Oaks Condominium Assn.*, 265 Conn. 579, 609, 830 A.2d 164 (2003).

The words ''retrieve'' and ''receive'' are not defined in this statutory scheme. Under their common dictionary

definitions, "retrieve" means "[t]o get back . . . [t]o find and carry back"; American Heritage Dictionary (4th Ed. 2007) p. 1188; whereas "receive" means "[t]o acquire or get something; be a recipient"). Id., p. 1161. I draw from these definitions that the legislature intended for only the municipal clerk or, if the requirements of § 7-19 are satisfied, any "appoint[ed]" and sworn assistant clerks to "retrieve" (i.e., go get) absentee ballots from the drop boxes under § 9-140b (c) (2). In contrast, "any person authorized by [the] municipal clerk" may "receive and process" (i.e., be given and then process) the ballots. General Statutes § 9-140b (d). There would be no absurd or unworkable result by interpreting "municipal clerk" to mean only the municipal clerk herself or himself and the clerk's appointed assistant clerks if the "absence or inability" requirement of § 7-19 is satisfied. As the plurality contends, and it is beyond cavil, the municipal clerk has many competing duties, especially on election day, and, thus, the "absence or inability" standard would appear to be easily met to permit assistant clerks to perform those duties. Where there are particular grants of authority for the clerk to authorize others to perform functions of that office, such as in § 9-140b (d), the clerk of the municipality finds additional relief. See *Marchesi* v. *Board of Selectmen*, 309 Conn. 608, 618, 72 A.3d 394 (2013) ("it is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly . . . or to use broader or limiting terms when it chooses to do so" (citation omitted; internal quotation marks omitted)).

Distinguishing between retrieving absentee ballots and undertaking other functions with those ballots is hardly without its rationality. In many contested elections (including this one), the custody of absentee ballots—from the time they leave the voter's hands to the time there are witnesses to their processing—is often

the center of controversy. See, e.g., *Lazar* v. *Ganim*, 334 Conn. 73, 78, 220 A.3d 18 (2019) (voters contested election results based on claim that defendants improperly handled absentee ballots in violation of § 9-140b); *Keeley* v. *Ayala*, 328 Conn. 393, 407, 179 A.3d 1249 (2018) (contesting election results based on claim involving whether party official or candidate could order police officer to retrieve absentee ballots from electors and to deliver them to town clerk). Because of the proliferation of absentee voting during the recent COVID-19 pandemic; see *Fay* v. *Merrill*, 338 Conn. 1, 8–9, 256 A.3d 622 (2021) (noting " 'a significant increase in the use of absentee ballots' " due to pandemic and broadening of authorization for who may request absentee ballot to include " 'COVID-19' "); and at a time when the legislature has amended legislation regarding absentee voting (that may continue to exist long after the pandemic is over); see Public Acts 2022, No. 22-2, § 1 (effective April 8, 2022), codified at General Statutes § 9-135 (a); it seems to me entirely sensible that the legislature might want the municipal clerk or a sworn assistant clerk—not just "any person authorized" by the clerk—to retrieve those ballots. If this is an undue burden, the legislature can change it.

Thus, although I agree with the plurality that § 9-140b (d) is plain and unambiguous, I believe that the plurality defines the phrase "municipal clerk" too broadly. This phrase is limited to the municipal clerk himself or herself, and, if § 7-19 is satisfied, the clerk's appointed assistant clerks. Therefore, I conclude that there was error in the absentee ballot retrieval procedure used in the election at issue because at least some evidence indicates that someone other than the municipal clerk or, assuming that the requirements of § 7-19 were satisfied, an appointed assistant clerk retrieved absentee ballots from some of the drop boxes. But it is not clear from

Cohen *v.* Rossi

the record before this court that this error had any effect on the election's outcome.

Accordingly, I respectfully concur in part.

ECKER, J. concurring in part and concurring in the judgment. Writing for the plurality, my colleague, Justice McDonald, reads the term "municipal clerk" in General Statutes § 9-140b (c) (2) to plainly and unambiguously mean the municipal clerk or the clerk's designees. In his concurrence, my equally learned colleague, Justice D'Auria, reads the same language to plainly and unambiguously mean the municipal clerk or an assistant clerk authorized pursuant to General Statutes § 7-19, and no one else. Reasonable minds will differ on many subjects, and even respected jurists with expertise in statutory construction will sometimes disagree about when a reading of a statute has strayed beyond the limits of plausibility. In the present case, I am convinced that both of my colleagues advance reasonable interpretations of § 9-140b (c) (2). At the end of the day, one interpretation must be wrong and the other right, but neither side is so clearly right or wrong that no room for doubt remains regarding who exactly is authorized to retrieve absentee ballots from drop box locations. "[M]ore than one reasonable interpretation of a statute" is the very definition of ambiguity under our case law. *Ledyard* v. *WMS Gaming, Inc.*, 338 Conn. 687, 698 n.6, 258 A.3d 1268 (2021). Under these circumstances, I see great benefit, and no conceivable harm, in looking at extratextual evidence that would help resolve our interpretive impasse. Indeed, General Statutes § 1-2z[1] contemplates precisely that approach.

---

[1] General Statutes § 1-2z provides that "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

Cohen *v.* Rossi

I am ultimately persuaded that the interpretation of § 9-140b (c) (2) adopted by the plurality is correct, only after considering the 2021 amendment of the statute and related legislative history. I therefore agree with and join parts II through VI of the plurality opinion and concur in the result reached in part I.

I

My colleagues and I disagree about whether § 9-140b (c) (2) is ambiguous. Ambiguity matters because § 1-2z prohibits a court from considering legislative history and other extratextual evidence unless the statutory meaning is ambiguous or the unambiguous meaning yields absurd or unworkable results. Section 1-2z prescribes a two step process for statutory interpretation. In the first step, we attempt to ascertain the meaning of the statute as applied to the facts of the case, without the benefit of extratextual sources of legislative intent. To do this, we try to derive ''the apparent intent of the legislature'' from the text itself, considering the broader legal and practical context. (Internal quotation marks omitted.) *Seramonte Associates, LLC* v. *Hamden*, 345 Conn. 76, 83, 282 A.3d 1253 (2022). If that process reveals a single, clear answer, then our task is complete. If, however, step one produces more than one plausible interpretation, or if the plain and unambiguous meaning yields absurd or unworkable results, then we may move on to step two.

In step two, we are permitted to consider legislative history and similar materials, which we are required to set aside in part one. In this way, § 1-2z limits the role of legislative history in statutory interpretation. By curtailing our use of legislative history, § 1-2z prevents overreliance on remarks by legislators or others that may not be the most reliable guide to what the legislature intended. As the legislature knows better than we do, legislative history is a far from perfect guide to

Cohen *v.* Rossi

legislative intent. The best evidence of the purpose of a statute is the language passed into law, not the stray remarks of individual legislators or persons testifying at legislative hearings.

This case is unusual because the court has produced two divergent opinions, each implicitly but necessarily claiming to offer the *only* reasonable interpretation of the same statutory provision. The plurality concludes that the term "municipal clerk" unambiguously means "the clerk or the clerk's designee." I disagree because I think it is at least reasonable to conclude, as the plaintiff, Barry Lee Cohen, argues, and as Justice D'Auria believes, that "municipal clerk" means simply "municipal clerk" and (unless the assistant clerk's role is activated under § 7-19)[2] nothing more. That is how the term is defined in the statutory scheme that governs absentee voting, of which § 9-140b (c) (2) is a part. See General Statutes § 9-1 (g) (defining "municipal clerk" as "the clerk of a municipality"); General Statutes § 9-1a (defining "municipal clerk" as "the town clerk in or for the municipality to which reference is made"). I cannot accept that a literal reading of the statute is not even plausible in these circumstances.

The existence of a plausible alternative interpretation is enough to create ambiguity. "[A]lthough there must be more than one reasonable interpretation of a statute in order for it to be considered ambiguous, those interpretations need not be necessarily strong or have a high probability of success. Put differently, a statute is plain and unambiguous when the meaning . . . is so strongly indicated or suggested by the [statutory] language . . . that

—————

[2] A duly appointed assistant clerk may, under specified circumstances, perform the duties of the municipal clerk pursuant to § 7-19. See footnote 3 of this opinion. Justice D'Auria and I agree that § 7-19 provides authority for a duly appointed assistant clerk to retrieve absentee ballots from a drop box only if the municipal clerk is absent or unable to perform those duties. See footnote 5 of this opinion.

Cohen *v.* Rossi

. . . it appears to be *the* meaning and appears to preclude any other likely meaning. . . . [I]f the text of the statute at issue . . . would permit more than one likely or plausible meaning, its meaning cannot be said to be plain and unambiguous.'' (Emphasis in original; internal quotation marks omitted.) *Ledyard* v. *WMS Gaming, Inc.*, supra, 338 Conn. 698 n.6. For this reason, among others, I believe that § 9-140b (c) (2) is ambiguous and would proceed to consider legislative history before reaching a decision about what the statute means as applied to the facts of this case.

In fairness to the plurality, the statutory language is not as straightforward as it appears. It might seem obvious that "municipal clerk" simply means "municipal clerk," but statutory interpretation is not an abstract exercise in stringing together dictionary definitions. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature . . . as applied to the facts of [the] case . . . ." (Internal quotation marks omitted.) *Wind Colebrook South, LLC* v. *Colebrook*, 344 Conn. 150, 161, 278 A.3d 442 (2022). The present case illustrates how the literal meaning of a term (the "municipal clerk," as the person) may become so intertwined and even conflated with a different meaning (the "municipal clerk," as the *office* of the municipal clerk, including its employees) that it is difficult to know which of the two different meanings was intended.

"As required by § 1-2z, we must determine whether this statutory language is ambiguous. The test to determine ambiguity is whether the statute, *when read in context*, is susceptible to more than one reasonable interpretation.'' (Emphasis added; internal quotation marks omitted.) Id., 165; see *King* v. *Burwell*, 576 U.S. 473, 486, 135 S. Ct. 2480, 192 L. Ed. 2d 483 (2015) ("oftentimes the meaning— or ambiguity—of certain words or phrases may . . . become evident [only] when placed in context" (internal quotation marks omitted)). Both the plurality and Justice

Cohen *v.* Rossi

D'Auria give substantial weight to commonsense and practical considerations about the operation of a municipal clerk's office, the feasibility of single-handedly retrieving all absentee ballots, and prevailing concerns about the integrity of our elections in connection with absentee voting. The application of practical wisdom in this manner is perfectly appropriate. "[C]ourts should not construe statutes in disregard of their context"; (internal quotation marks omitted) *State* v. *Banks*, 321 Conn. 821, 842, 146 A.3d 1 (2016); and "there is no canon against using common sense . . . ." *Roschen* v. *Ward*, 279 U.S. 337, 339, 49 S. Ct. 336, 73 L. Ed. 722 (1929). This court repeatedly has held that the threshold ambiguity analysis under § 1-2z should and must take into account these commonsense, practical considerations regarding how the statutory scheme will operate in the real world. See, e.g., *Seramonte Associates, LLC* v. *Hamden*, supra, 345 Conn. 91 (relying on practical considerations in determining whether statute was plain and unambiguous); *Casey* v. *Lamont*, 338 Conn. 479, 493, 258 A.3d 647 (2021) (considering commonsense implications of statutory construction before resorting to extratextual sources to glean legislature's intent); *Planning & Zoning Commission* v. *Freedom of Information Commission*, 316 Conn. 1, 18 n.13, 110 A.3d 419 (2015) (considering whether proffered construction of statute "would belie common sense" in assessing ambiguity).

The difference between my view and the views of my colleagues is that these contextual considerations only strengthen my conviction that the term "municipal clerk," as used in § 9-140b (c) (2), is ambiguous. The term might plausibly mean "the clerk or the clerk's designee," but it might also plausibly mean the clerk alone (or the assistant clerk if the requirements of § 7-19 are met). The plurality relies on three arguments to arrive at the conclusion that, despite first appearances, the operative language plainly and unambiguously permits the clerk's authorized desig-

Cohen *v.* Rossi

nee to retrieve the absentee ballots. See part I of the plurality opinion. I find these arguments to be, for the most part, persuasive enough to create ambiguity regarding the meaning of § 9-140b (c) (2). I do not agree, however, that they render the alternative reading so unreasonable that there is no need to consult the legislative history.

First, the plurality contends that the reference to the municipal clerk in § 9-140b (c) (2) must include the clerk's designee because § 7-19 allows the municipal clerk to delegate responsibilities.[3] This point achieves only limited traction. Section 7-19, by its express terms, applies only to "assistant town clerks" who have "taken the oath provided for town clerks . . . ." No other persons are authorized by § 7-19 to act for the municipal clerk. The record in the present case reveals that only one of the three individuals who retrieved absentee ballots at the clerk's request was an assistant town clerk and, thus, a permitted designee under § 7-19.[4] Additionally, an assistant town clerk has "all the powers and [may] perform all the duties of the town clerk" only if the town clerk is absent or unable to perform his or her duties. General Statutes § 7-19. With one exception, there is no evidence in the present case to indicate that, on each of the dates that the absentee ballots were collected from drop boxes, the town clerk was absent or otherwise unable to perform her duties.[5]

_____

[3] General Statutes § 7-19 provides in relevant part: "Each town clerk may, unless otherwise provided by charter or ordinance, appoint assistant town clerks, who, having taken the oath provided for town clerks, shall, in the absence or inability of the town clerk, have all the powers and perform all the duties of the town clerk. . . ."

[4] Sharon Recchia was designated as an assistant clerk, and she retrieved some of the absentee ballots cast in the 2022 election. Municipal employees Jasmine Acevedo and Lori Moran also retrieved absentee ballots. There is no evidence that either Acevedo or Moran was an authorized delegee under § 7-19.

[5] The municipal clerk was not present in the clerk's office on election day, and, therefore, I agree with the plurality that "the retrieval of ballots from the drop boxes on election day by an assistant clerk would plainly be permissible under § 7-19 . . . ." Footnote 5 of the plurality opinion.

Cohen *v.* Rossi

The fact that § 7-19 expressly authorizes the town clerk to delegate her duties to a duly appointed assistant clerk plainly does not demonstrate that § 9-140b (c) (2) permits an unfettered delegation of duties. Indeed, it could be argued that, by expressly providing for a limited delegation of authority, the statutory scheme prohibits any other delegation of authority except in accordance with the constraints of § 7-19. See, e.g., *DeNunzio* v. *DeNunzio*, 320 Conn. 178, 194, 128 A.3d 901 (2016) ("[u]nder the doctrine of expressio unius est exclusio alterius—the expression of one thing is the exclusion of another—we presume that when the legislature expresses items as a group or series, an item that was not included was deliberately excluded").

Second, the plurality argues that subsection (d) of § 9-140b contemplates that someone other than the town clerk will receive and process absentee ballots. I disagree. Subsection (d) of § 9-140b provides in relevant part that "[n]o person shall have in his possession any official absentee ballot or ballot envelope . . . except . . . *any person authorized by a municipal clerk to receive and process official absentee ballot forms on behalf of the municipal clerk*, any authorized primary, election or referendum official or any other person authorized by any provision of the general statutes to possess a ballot or ballot envelope." (Emphasis added.) This subsection makes possession of an official absentee ballot or ballot envelope unlawful, with an exception for, among others, any persons authorized to "receive and process" the absentee ballots on behalf of the clerk. The provision says nothing about *who* is authorized "to receive and process official absentee ballot forms" but merely states that only persons so authorized may be in possession of the ballots.[6] General Statutes § 9-140b (d).

---

[6] Even if, for the sake of argument, subsection (d) of § 9-140b were construed as an implied grant of authority, the specific action authorized is "receiv[ing] and process[ing]" absentee ballots, not "retriev[ing]" absentee ballots from a drop box, which is the particular conduct referenced in § 9-140b (c) (2).

Cohen *v.* Rossi

Finally, the plurality reasons that the legislature must have intended to permit a municipal clerk to delegate the duty to retrieve absentee ballots from drop boxes because the clerk has many other statutory responsibilities relating to absentee voting, and it is implausible that the legislature intended to impose such manifold and onerous responsibilities on a single public official without the ability to delegate. This is a good and persuasive argument, but in no way does it remove the ambiguity from the statute. Instead, it gives rise to ambiguity or adds to its presence.

It is at least plausible that the language the legislature employed was intended to establish a strict procedure for handling absentee ballots. Section 9-140b (c) (2) is part of chapter 145 of title 9 of the General Statutes, which governs absentee voting procedures. See General Statutes § 9-133f. These statutes establish mandatory procedural requirements to protect against fraud and corruption in the use of absentee voting. See *Keeley* v. *Ayala*, 328 Conn. 393, 411, 179 A.3d 1249 (2018). The procedural requirements are exacting, extensive, and detailed. See generally General Statutes § 9-133f et seq.[7] They cover the entire life cycle of the balloting process, including eligibility and application procedures for absentee voters; printing, form and inspection procedures for absentee ballots; distribu-

[7] See, e.g., General Statutes § 9-135b (form, layout and inspection protocols for absentee ballots); General Statutes § 9-137 (oath and inner envelope for ballot); General Statutes § 9-138 (outer envelope for ballot and inner envelope); General Statutes § 9-139a (Secretary of the State's obligations regarding provision to municipal clerks of ballots, envelopes and instructions); General Statutes § 9-139c (municipal clerk accountability and reporting requirements); General Statutes § 9-140 (application for and issuance of absentee ballots, distribution of absentee ballot applications, mailing unsolicited absentee ballot applications, and summary of absentee ballot voting laws); General Statutes § 9-140a (singing of form and insertion of absentee ballot in envelopes); General Statutes § 9-140b (return of absentee ballots and restrictions on possession of absentee ballots and envelopes); General Statutes § 9-140c (sorting of absentee ballots and checking of names on registry list, rejection of absentee ballots, times for delivery of ballots, and retention of late ballots).

Cohen *v.* Rossi

tion, execution, handling, processing, tabulation and accounting procedures for the ballots; and more. Specific statutory provisions include elaborate requirements governing the chain of custody of these ballots to ensure that the absentee voting process, which, by definition, occurs outside of the controlled environment of regular voting locations, is not corrupted—whether accidentally or intentionally—by mishandling, meddling or any other irregularity. "[T]he procedures required by the absentee voting laws serve the purposes of enfranchising qualified voters, preserving ballot secrecy, preventing fraud, and achieving a reasonably prompt determination of election results . . . . This court previously has recognized that there is considerable room for fraud in absentee [ballot] voting and that a failure to comply with the regulatory provisions governing absentee [ballot] voting increases the opportunity for fraud." (Internal quotation marks omitted.) *Keeley* v. *Ayala*, supra, 407. In this context, it strikes me as at least reasonable to construe § 9-140b (c) (2), as the plaintiff and Justice D'Auria do, to mean that the legislature intended the municipal clerk, and no one else,[8] to personally carry out particular duties relating to absentee ballots.[9]

I do not claim that the plurality is wrong about the meaning of § 9-140b (c) (2). The plurality's interpretation is textually plausible and entirely sensible in the context of the facts and the larger statutory scheme. My point simply is that this is not the *only* reasonable reading of

[8] Again, this means no one else except for a duly appointed assistant clerk acting pursuant to § 7-19.

[9] The plaintiff and Justice D'Auria follow different paths to reach the same conclusion. Their positions also differ in that the plaintiff, unlike Justice D'Auria, does not contend that the statutory meaning that he promotes is plain and unambiguous. Although I agree with aspects of Justice D'Auria's concurring opinion, I disagree in two respects: (1) I do not consider the statute to be plain and unambiguous; and (2) I find the plurality's interpretation of the statute marginally more persuasive as it relates to who may retrieve the ballots.

Cohen *v.* Rossi

the statute, for the reasons that I have explained. In § 1-2z terms, the statutory meaning that the plurality ascertains from the operative text and statutory context is not plain and unambiguous. As a consequence, I would proceed, as I do in part II of this opinion, to consider extratextual evidence to the extent it illuminates the legislative intention behind the relevant statutes.

II

Section 9-140b (c) (2) was amended during a special session in June, 2021. See Public Acts, Spec. Sess., June, 2021, No. 21-2, § 102 (Spec. Sess. P.A. 21-2).[10] The prior version of the statute provided in relevant part: "In the case of absentee ballots mailed under subparagraph (B) of subdivision (1) of this subsection . . . the municipal clerk shall (A) retrieve from the secure drop box described in said subparagraph each such ballot deposited in such drop box, and (B) *if the drop box is located outside a building other than the building where the clerk's office is located, arrange for the clerk or the clerk's designee to be escorted by a police officer during such retrieval.*" (Emphasis added.) General Statutes

───────

[10] The plurality appears to consider the prior version of the statute to be extratextual evidence of legislative intent. See part I of the plurality opinion. Justice D'Auria indicates agreement with that view. See footnote 2 of Justice D'Auria's concurring opinion. That position is open to doubt. Compare *Chestnut Point Realty, LLC* v. *Windsor*, 324 Conn. 528, 537–38, 153 A.3d 636 (2017) (treating statutory genealogy as extratextual evidence), *Donahue* v. *Veridiem, Inc.*, 291 Conn. 537, 546 n.8, 970 A.2d 630 (2009) (§ 1-2z "permits resort to extratextual sources, such as amendments to the statute, [only] after there is a determination that the text is ambiguous"), and *Harpaz* v. *Laidlaw Transit, Inc.*, 286 Conn. 102, 112, 942 A.2d 396 (2008) ("[because] the statute yields no plain meaning . . . we turn to [its] genealogy and legislative history . . . to answer the issue raised in this appeal"), with *Housatonic Railroad Co.* v. *Commissioner of Revenue Services*, 301 Conn. 268, 305, 308, 21 A.3d 759 (2011) (considering "the genealogy of the statute" in determining whether statute was plain and unambiguous under § 1-2z). For present purposes, however, I will assume, for the sake of argument, that both the prior text of the statute and its legislative history should be treated as "extratextual evidence" under § 1-2z.

Cohen *v.* Rossi

(Rev. to 2021) § 9-140b (c) (2). Thus, the statute, in its current form, was amended to delete the reference to the "clerk's designee" and a police escort during the retrieval of absentee ballots from certain drop boxes. The deletion of the "clerk's designee" from § 9-140b (c) (2) would seem to support the plaintiff's argument that the legislature intended only for the municipal clerk, and no one else, to retrieve absentee ballots from drop boxes. A closer look at the relevant legislative history, however, is instructive regarding the reason for this statutory amendment and undermines the plaintiff's claim.

As the trial court, *Wilson, J.*, observed in her comprehensive memorandum of decision, the purpose of this statutory amendment "was twofold: (1) to make the absentee ballot drop boxes permanent; and (2) to delete the requirement that a police officer accompany the clerk or the clerk's designee when [he or she] retrieve[s] ballots from a drop box other than the one located outside the municipal clerk's office building." As recounted by the trial court, former Secretary of the State Denise W. Merrill testified during a March 10, 2021 hearing of the Government Administration and Elections Committee about the purpose of the proposed amendment:[11] " 'Its purpose is to make the administration of elections easier for local officials and [to] make navigating that administration easier for voters. . . . The secure absentee ballot drop box provision would make these drop box[es] . . . a permanent convenient part of Connecticut elections.' [Conn. Joint Standing Committee Hearings, Government Administration and Elections, 2021 Sess. (March 10, 2021) pp. 18–19,

---

[11] The public hearing was on Senate Bill No. 1017, which contained the same statutory amendment ultimately enacted in § 102 of Spec. Sess. P.A. 21-2 during the legislature's special session in June, 2021. Like the trial court, I find the legislative history of Senate Bill No. 1017 to be illustrative of the legislative intent animating § 102 of Spec. Sess. P.A. 21-2.

Cohen *v.* Rossi

remarks of Secretary of the State Merrill.] Representative [Gale] Mastrofrancesco later asked whether a police escort would need to accompany the town clerk to retrieve absentee ballots from the drop box. Id., [p.] 29. Merrill responded: '[W]e [have] consulted with the town [clerks] and we asked them . . . do you think this is necessary because essentially, this is a job for the town [clerks], it's a way of making their jobs easier frankly. . . . You know there's a vast variety of towns in the state, so they told us they didn't think it was necessary, that they thought they were capable of doing it without the police presence, [that they] had absolutely no problems with the ballot boxes . . . .' Id. [pp. 29–30.]

"Representative Mastrofrancesco then specifically asked Merrill: '[S]o the town clerk will be responsible for picking up the ballots, [does it have] to be the town clerk specifically picking up the ballots out of the box or can [he or] she just send . . . anybody [there] to pick them up.' Id., [p.] 30. Merrill responded: 'I believe the town clerk[s] [have] to do that themselves, I mean . . . either a town clerk or designee of the town clerk, they can designate certainly I'm sure they have assistance and all kinds of people in their office [who] would be available to pick them up.' Id. Representative Mastrofrancesco replied: '[S]o pretty much anybody [who] works for the town [he or] she can really designate anybody to go pick up those ballots.' Id. Merrill responded: 'Yes, well similar to, they could send somebody to the mail room to pick up the ballots from the mail to[o] same idea. Ballot boxes are treated exactly like mailboxes essentially.' Id."

On the basis of the foregoing legislative history and the practical difficulties identified by the plurality, I agree with the trial court that "the legislature's purpose [in] amending § 9-140b (c) (2) was to make the drop boxes permanent for future elections and to omit the

requirement that a police officer escort the town clerk or her employees when retrieving absentee ballots from drop boxes around the town or city. There is no indication that the amendment's purpose was to require that only the municipal clerk herself retrieve the absentee ballots from the drop boxes." The legislative history thus confirms the plurality's construction of the statute and illustrates that the appropriate use of extratextual evidence will serve to effectuate (rather than undermine) the legislative will. Because I agree with the plurality that the municipal clerk was permitted under § 9-140b (c) (2) to designate municipal employees within her office to retrieve absentee ballots from the secure drop boxes on her behalf, I concur in the result reached in part I of the plurality opinion.

———————————————